**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jacob T. ELLZEY (88–3459) and Paul W. Cochran (88–3470),**
**Defendants–Appellants.**

**Nos. 88–3459, 88–3470.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 23, 1989.

Decided April 24, 1989.

---

Dale E. Williams, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Columbus, Ohio, for the U.S., plaintiff-appellee.

Thomas M. Tyack (argued), Columbus, Ohio, for Jacob Timothy Ellzey, defendant-appellant.

Neil W. Rosenberg (argued), Columbus, Ohio, for Paul W. Cochran, defendant-appellant.

Before KEITH, JONES and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

In this consolidated appeal Paul W. Cochran and Jacob T. Ellzey challenge their convictions for conspiracy, 18 U.S.C. § 371; mail fraud, 18 U.S.C. § 1341 and § 2; wire fraud, 18 U.S.C. § 1343 and § 2; and interstate transportation of securities obtained by fraud, 18 U.S.C. § 2314 and § 2. The issues raised by both parties on appeal concern (1) the sufficiency of the evidence to sustain their convictions and (2) the improper admission of evidence. Ellzey also challenges as reversible error the court's failure to record side-bar conferences at trial in violation of 28 U.S.C. § 753. For the reasons that follow, we affirm both defendants' convictions.

On December 3, 1987, Cochran and Ellzey were indicted on fifteen and thirteen counts respectively of conspiracy, mail fraud, wire fraud, and interstate transportation of securities obtained by fraud. These charges stemmed from the defendants' alleged operation from October 1983 through December 1985 of an advance fee scheme designed to defraud farmers who were seeking loans to fend off foreclosure on their farms.[1]

Paul Cochran was a farmer in Morrow County, Ohio, from 1969 until 1983, when he lost his farm due to foreclosure. In October 1983, Cochran established an Ohio business called "D.C. Financial Services, Inc." (D.C.). Beginning in 1984, D.C. advertisements in various farm magazines including "The Prairie Farmer," "The Ohio Farmer," and "Farm Futures," solicited farmers seeking refinancing loans to contact D.C. for assistance.

D.C. received numerous phone inquiries in response to the advertisements. Cochran generally responded to the inquiries. Typically, after a cursory review of a prospective borrower's financial status, Cochran arranged a personal meeting at the prospective borrower's farm and represented himself to be successful in securing refinancing loans for farmers. At that time, pursuant to contracts executed by himself and the farmer, Cochran collected advance fees for his loan preparation work. The contract also provided for a percentage of the loan (percentage fee) to be paid to Cochran provided he secured financing for the farmers. Although the contract originally provided that this percentage fee was not due until the loan money was placed in an escrow account on behalf of the borrower, Cochran subsequently had the borrowers sign amendments rendering the percentage fee due upon the farmer's receipt of a loan commitment letter that approved the farmer's loan application and indicated that the loan funds were forthcoming. In some instances, Cochran promised to refund advance percentage fees plus interest if the borrower's loan failed to close.

In the meantime, Jacob Ellzey, in November 1983, established an Ohio business called "J.T.E. Financial Enterprises" (J.T.E.). Although Ellzey claims that J.T.E. was totally separate and independent from D.C., the government contends that J.T.E. purportedly was established to obtain loans for D.C.'s clients. Ellzey operated J.T.E. from his apartment residence in Columbus, Ohio, and, like Cochran, represented himself to be successful in securing refinancing loans for farmers.

The government's evidence revealed that shortly after farmers paid advance fees to Cochran, Cochran contacted Ellzey, who prepared loan commitment letters indicating approval by J.T.E. of the farmers' loan applications. Cochran subsequently delivered these letters to the farmers at which time he collected his percentage fees, which he shared with Ellzey. In some instances the advance percentage fee was wired directly by the farmers to Cochran's bank.

1. Although the indictment details Cochran's and Ellzey's dealings with five farmers (Donald and Blanche Kurtz, James Brooks, Ronald and Sonna Crowder, Richard and Katherine Slingwine, and Donald and Jean Stewart), other defrauded farmers are mentioned (Alan Bland and Donald Boebel). Moreover, although these parties are named in the indictment, the indictment explicitly states that the defendants' alleged illegal conduct is not limited to dealings with those named in the indictment.

When the loan funds were not provided when promised, both Cochran and Ellzey sent "lulling letters" to anxious borrowers indicating that their loan closings were forthcoming.

By way of illustration of how the alleged scheme operated, Donald and Blanche Kurtz of Illinois sought to refinance their farm loan and responded to a D.C. advertisement in September 1984. Cochran visited their farm a few weeks later to discuss arrangements for a $1,400,000 loan. He collected an advance fee of $3,500.[2] He returned in October 1984 to deliver a J.T.E. commitment letter approving their loan application. At that time he collected a $28,000 percentage fee, which he deposited in D.C.'s Ohio bank account. Three thousand dollars of the percentage fee was forwarded to Ellzey. The Kurtzes never received a loan or a refund of the percentage fee. They did, however, receive several letters from Cochran and Ellzey anticipating an imminent closing for the loan. Eventually, the Kurtzes were advised that they would be dropped from the loan program and that they would not receive a refund. They ultimately lost their family farm.

Although the government contended that Cochran and Ellzey never intended to obtain the loans promised to the farmers, both Cochran and Ellzey reportedly relied on an Illinois money broker, Richard L. Jones, who allegedly agreed to supply the funds for the loans in return for a profit. According to an alleged July 1984 agreement between Ellzey and Jones, Ellzey became authorized to broker approximately $15 million for Jones. Jones agreed to make the funds available to prospective borrowers within 120 days. Ellzey conveyed this information to Cochran who verified it with Jones by phone. Cochran also claims to have investigated Jones with Illinois banks and the Illinois attorney general's office to satisfy himself of Jones's legitimacy as a lender. Unbeknown to Cochran, Jones was then under state investigation for fraud. Cochran then submitted various loan applications to Ellzey who, in

turn, issued the previously mentioned letters from J.T.E. Although Ellzey apparently was unaware of the original or amended percentage fee agreement between Cochran and borrowers, he did acknowledge receipt of "customary co-broker fees" from Cochran. Richard Jones never did provide the funds to support Cochran's and Ellzey's loan commitments. Jones died in 1986.

When they became aware that no loan funds were forthcoming, Cochran and Ellzey declined to refund any of the farmers' advance fees.[3] Two farmers testified that, in response to their pleas for Ellzey to obtain their loan money, Ellzey advised them to forget about him (Ellzey), that the farmers' advance money was spent, and that Ellzey wanted nothing further to do with them. As a consequence of their dealing with Cochran and Ellzey, several farmers lost their farms, one suffered a stroke and his wife suffered a heart attack.

Following their convictions by a jury on all counts, both Cochran and Ellzey appeal.

### I.

We first consider the defendants' claims that their convictions are not supported by sufficient evidence on either the conspiracy or substantive counts of the indictment. To that end, Cochran denies that the record discloses any intent to defraud farmers who paid him advance or percentage fees for legitimate work. He claims that once the loan commitments were in place his work was complete, notwithstanding the absence of actual loan funds. Cochran also denies conspiring with Ellzey to defraud anyone. He claims that his only bond with Ellzey was their shared belief in the legitimacy of Jones as a lender. Similarly, Ellzey testified that there was no conspiracy to defraud, that his business was independent from Cochran's, and that his involvement with Cochran and Cochran's clients was limited to a relatively small number of transactions based on a legitimate belief that Jones would fund the loans submitted

---

2. This advance fee was the only fee that was refunded.

3. But *see supra* note 2.

by Cochran to Ellzey on what was essentially a co-brokerage basis. Moreover, Ellzey contends that since he was unaware of the percentage fee amendment, he could not have participated in a conspiracy to defraud. Ellzey also contends that the notion that he was an aider or abettor is erroneous given that his involvement in any of the substantive charges is limited to having issued commitment letters based on a legitimate belief that funds would be forthcoming from Jones.

In a criminal case the standard of review for claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Moreover, circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not "remove every reasonable hypothesis except that of guilt." *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984). We have clearly indicated that we "will reverse a judgment for insufficiency of evidence only if th[e] judgment is not supported by substantial and competent evidence upon the record as a whole, and that this rule applies whether the evidence is direct or wholly circumstantial." *Id.* at 363.

With respect to the conspiracy charge, we have recognized that the government need not prove a formal agreement to establish the existence of a conspiracy to violate federal law and that a tacit or mutual understanding among the parties will suffice. *United States v. Bavers,* 787 F.2d 1022, 1026 (6th Cir.1985). Moreover, "[a] conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* at 1026 (citations omitted). In this case, the record contains ample evidence from which to reasonably infer the existence of a tacit or mutual understanding between Cochran and Ellzey to engage in a common plan to defraud farmers. According to Cochran, he was first introduced to Ellzey when Cochran himself was trying to stave off foreclosure on his farm. Ellzey referred Cochran to Summers, a man who agreed to lend Cochran and others sufficient money to protect their farms. Over a period of three years Cochran allegedly paid Summers over twenty-five thousand dollars but never received the funds he sought to borrow. Yet, rather than distancing himself from Ellzey or Ellzey's business contacts, Cochran subsequently agreed to funnel loan applications of other unsuspecting, needy farmers to Ellzey on the belief that Ellzey had authority to broker funds for Jones. Jones, like Summers, never provided the promised funds.

Numerous defrauded farmers testified as to the *modus operandi* of Cochran and Ellzey, as has been previously described. Cochran and Ellzey seek to negate any intent to defraud by professing reliance on the legitimacy of Jones as a lender. Yet, the record shows that well after October 1984, when Ellzey deemed his relationship with Jones to be over, Ellzey continued to send lulling letters to the farmers to appease their anxiety over their tardy loans. The letters suggested that the farmers' loans were forthcoming. Although the farmers believed that their loan applications were being submitted to legitimate lenders, the record disclosed that Cochran submitted their loan applications to J.T.E. or reported that the application had been reviewed and/or rejected by Midland Marketing or Perry Temple of Temple Mortgage Company. The record disclosed that Midland Marketing was a non-existent entity created by Cochran and that at the time of his alleged review of loan applications, Perry Temple was dead. The record also disclosed that the D.C. office stocked Temple Mortgage Company "turn-down" letters that were sent out notwithstanding the fact that Temple was dead. Even when it became clear that Jones's money was not forthcoming, neither Cochran nor Ellzey returned any advance fees, with the exception of one $3,500 fee, to the farmers. Those farmers that persisted in their efforts to obtain a refund or loan through Cochran and Ellzey were rebuffed and advised that their advance money was gone

and that no further efforts would be extended on their behalf.

Based on all of the foregoing facts, we conclude that a rational trier of fact, viewing the evidence most favorably to the government could have found the essential elements of a conspiracy between Cochran and Ellzey to defraud farmers and of various criminal acts charged in furtherance of the conspiracy. The fact that the government relies on circumstantial evidence indicative of a tacit understanding between Cochran and Ellzey to defraud the farmers is by no means fatal to its case. Accordingly, we find the evidence sufficient to sustain the convictions of both Cochran and Ellzey.

## II.

■ Both Cochran and Ellzey claim that the district court committed reversible error by admitting irrelevant evidence of Cochran's "other bad acts" involving loan transactions with John Stroup and Kenton Ernst. Neither transaction is mentioned in the indictment. The court admitted testimony by Stroup and Ernst pursuant to Fed.R.Evid. 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Before admitting evidence of a defendant's other crimes, wrongs, or acts, the court must determine that the evidence would serve a permissible purpose such as articulated in Fed.R.Evid. 404(b) and that the probative value of that evidence outweighs its potential prejudicial effect. *United States v. Huddleston*, 811 F.2d 974 (6th Cir.1987), *aff'd*, —— U.S. ——, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The court admitted the testimony of Stroup and Ernst as evidence of a common plan to defraud farmers and determined that the probative value of the testimony outweighed any prejudicial effect. Fed.R.Evid. 403. Moreover, the judge issued a limiting instruction to the jury explaining the purpose for which the testimony was being admitted and that the defendants were not then being tried for acts or conduct not alleged in the indictment.

We find no abuse of discretion in the district judge's admission of this testimony. *See Huddleston*, 811 F.2d 974. Moreover, our conclusion that sufficient evidence supports the defendants' convictions is not in any way dependent on the cumulative evidence offered by Stroup and/or Ernst. Nevertheless, even if this evidence was improperly admitted, given the extent of the government's evidence in the record, any error in admitting Stroup's and Ernst's testimony would constitute harmless error. *Huddleston*, 811 F.2d at 977.

■ Ellzey also challenges the district court's admission of alleged hearsay by Cochran's former secretary, Joan Beveridge, regarding Cochran's financial condition. The testimony in question provides:

Q. Were you aware of any reason why Paul Cochran could not use his tax I.D. number or his social security number?

A. At that time, no. Later on, I did become aware.

Q. At what point in time did you become aware?

A. Eileen set me down and explained to me that he was in Chapter 11.

Objection by Counsel.

THE WITNESS: Like I say, Eileen set me down and began to explain to me Paul had gone into a Chapter 11 with his farm and he was not allowed to do any transactions through checking or credit of any kind; that he had to do strictly cash. She also said that she thought that he didn't want anything to be, you know, to be able to be traced back to him and that he was basically using me as the means to have access to the funds.

Objection by Counsel with Motion to Strike.

Overruled by the Court.

Ellzey contends that admission of this testimony deprived him of a fair trial because he was unable to cross-examine Eileen, the declarant.

By definition, hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Accordingly, if Beveridge's testimony was offered to prove that Cochran was in bankruptcy, her testimony would be hearsay. In this case, however, as the government points out, the testimony was offered to explain Beveridge's understanding of why she was instructed by Cochran to use *her* social security number to identify *his* business bank account. Accordingly, the testimony was not hearsay and was admissible. Again, given the extent of the government's evidence against Cochran and Ellzey and given that Cochran himself discussed his Chapter 11 filing, any error or prejudice resulting from the admission of Beveridge's testimony would also constitute harmless error. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). ("[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.").

### III.

■ Ellzey's final argument on appeal is that he was deprived of a fair trial by the district court's failure to record side-bar conferences. Ellzey contends that the district court's conduct violated 28 U.S.C. § 753, which requires all trial proceedings to be placed on the record. Section 753(b) in pertinent part provides:

Each session of the court and every other proceeding designated by rule or order of the court or by one of the judges shall be recorded verbatim by shorthand, mechanical means, electronic sound recording, or any other method, subject to regulations promulgated by the Judicial Conference and subject to the discretion and approval of the judge. The regulations promulgated pursuant to the preceding sentence shall prescribe the types of electronic sound recording or other means which may be used. Pro-

ceedings to be recorded under this section include (1) all proceedings in criminal cases had in open court; (2) all proceedings in other cases had in open court unless the parties with the approval of the judge shall agree specifically to the contrary; and (3) such other proceedings as a judge of the court may direct or as may be required by rule or order of court as may be requested by any party to the proceeding.

Ellzey claims that the failure of the trial court to record the side-bar conferences prevented him from determining whether the substance of the conferences provided a basis for appeal. In resolving this issue, we are guided by our opinion in *United States v. Gallo,* 763 F.2d 1504 (6th Cir. 1985), *cert. denied sub nom. Graewe v. United States,* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986). In *Gallo,* we recognized that the section 753 recording requirement is a mandatory rule. We also noted, however, that a violation of the mandate is not *per se* error requiring, without more, reversal. *Id.* at 1530. We indicated that "[a]bsent a showing by counsel on appeal of a reasonable but unsuccessful effort to determine the substance of the off-the-record remarks and the nature of a claimed error, reversal is not an appropriate remedy." *Id.* Moreover, we stated that a reviewing court must consider all circumstances in the record surrounding the failure to record in order to ascertain whether the failure created hardship or prejudice. *Id.* at 1531. We also noted, as guidance, that failure to record comments to the jury made by the judge or counsel are disfavored more than comments made during side-bar discussions, that a court's willingness to have counsel record objections after an "off-the-record" conference reduces the likelihood of prejudice and need for reversal, and that counsel may waive objections to the court's conduct by acquiescence or consent, notwithstanding the court's failure to comply with section 753. In *Gallo,* we determined that defendants waived any objection to unrecorded side-bar discussions, in part, because they failed to articulate specific substantive errors of

the court made during those discussions. 763 F.2d at 1531.

In the present case, Ellzey points to a "series" of entries in the record documenting or related to off-the-record discussions. Upon review of the record, however, we are persuaded that Ellzey has not demonstrated any hardship or prejudice stemming from the court's failure to, in every instance, record side-bar discussions with counsel. Hence, reversal is not indicated.

To begin with, because the off-the-record comments here were exclusively directed to counsel, we do not view the court's omission with the same degree of disfavor that would be evoked had the comments been directed to the jury. Ellzey does not claim to have objected or attempted to object to the court's conduct of the proceeding off the record and the record reveals no such objection. Ellzey's acquiescence in the court's conduct, like the defendants' in *Gallo*, may be construed as a waiver in view of his failure to postulate any specific substantive error that may have been committed by the court during the side-bar conferences. Ellzey merely claims that the failure to record these conferences deprived him of an opportunity to examine them for possible grounds for appeal. Yet, if such was his intent, Ellzey has not shown that he made any reasonable or unsuccessful effort to determine the substance of the unrecorded remarks. Under Fed.R.App. 10(c),[4] Ellzey could have prepared a statement of the evidence or proceedings on the basis of his own recollection or otherwise and submitted it first to the prosecution for objections and/or amendments and then to the district court for settlement and approval after which the statement would have become part of the record.

More importantly, evidence of the circumstances surrounding the failure to record strengthens our view that Ellzey was not prejudiced. For example, Ellzey claims that in one side-bar conference at which he was present, he allegedly was instructed that if he asked a certain question the court would ask questions calculated to undermine the cross-examination. Yet, the record discloses that Ellzey's counsel paraphrased the substance of that side-bar discussion on the record and responded affirmatively to the court's inquiry as to whether he got what he wanted from his cross-examination. As such, any claim of hardship or prejudice stemming from the failure to record the conference is unfounded. Moreover, following another discussion off the record, Ellzey's counsel was permitted, for the record and outside the hearing of the jury, to record the substance of the judge's ruling on the admissibility of evidence that Ellzey objected to as inadmissible hearsay. The judge's willingness to permit Ellzey's counsel to record his continuing objection to the admission of the evidence following the off-the-record conference also militates against any prejudice or need for reversal. In fact, Ellzey relies on the judge's evidentiary ruling as one of his grounds for appeal.

As for other specified instances of unrecorded side-bar conferences,[5] we are persuaded that although the court was remiss in failing to conduct the conferences on the record, outside the hearing of the jury, the court's failure to record them, in this instance, does not necessitate reversal.

---

**4.** Rule 10(c) provides:

If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.

**5.** The government notes that three of the instances of unrecorded side-bar conferences were initiated (1) to chastise the prosecution for the failure of its witnesses to report to the proper federal building; (2) to counsel a prosecutor not to lose his temper because of a defendant's testimony; and (3) to confer with Ellzey's counsel about an appropriate point to interrupt his examination to adjourn proceedings for the day.

For the foregoing reasons, the defendants' convictions are AFFIRMED.