974 F.2d 1339
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert HASTING and Mose Graham, III, Defendants-Appellants.
 Nos. 91-6234, 91-6311.
 United States Court of Appeals, Sixth Circuit.
 Sept. 1, 1992.
 
 Before BOYCE F. MARTIN, Jr., SUHRHEINRICH and KRUPANSKY, Circuit Judges.
 PER CURIAM:
 
 
 1
 Defendants Robert Hasting (Hasting) and Mose Graham, a.k.a. Junebug (Graham), appealed their jury convictions and sentences for conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846 and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).
 
 
 2
 On March 13, 1991, a grand jury returned a six count indictment charging defendants Deborah Wilhoite (Wilhoite)[1], Graham and Hasting with one count of conspiracy to distribute or possess with the intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (count one). Graham and Wilhoite also were charged with two substantive counts of distribution or possession with the intent to distribute cocaine within 1,000 feet of a school in violation of 21 U.S.C. §§ 841(a)(1) and 845, and 18 U.S.C. § 2 (counts five and six).
 
 
 3
 In March of 1990, a confidential informant, Lavon Powell (Powell), was hired by John Driscoll (Driscoll), an official with the United States Postal Service (USPS), to investigate the involvement, if any of certain postal employees in unlawful drug trafficking. On October 16, 1990, Powell, while under the direction and surveillance of the USPS, initiated the first of a series of drug purchases from Wilhoite, a postal employee. During these transactions, Powell was fitted with a recording device to record conversations between Powell and suspected drug dealers.
 
 
 4
 Powell purchased cocaine from Wilhoite on five occasions. The first three transactions were conducted solely between Powell and Wilhoite. During the fourth transaction, Powell entered Wilhoite's apartment and a man, whom Powell later identified at trial as defendant Graham, came to the door and sold Wilhoite a plastic bag containing one ounce of cocaine. The next transaction occurred one week later in Wilhoite's automobile during which Graham delivered another ounce of cocaine to Powell.
 
 
 5
 The following week, on December 11, 1990, Powell returned to Wilhoite's neighborhood at the direction of the USPS to purchase cocaine directly from Graham without Wilhoite's assistance. He was not wearing a recording device during this encounter. Powell observed defendant Hasting sitting outside Wilhoite's apartment building. Because Powell knew "Bob was dealing" from conversations he had had with Wilhoite, he asked Hasting the price of an ounce of cocaine. Hasting advised him that it was about $1,200. Hasting agreed to call "Junebug" for Powell to arrange a meeting for 3:30 p.m. that afternoon.
 
 
 6
 Before the afternoon rendezvous with Graham, Powell contacted the Postal Inspectors and was refitted with a recording device. He returned early to the meeting site and again encountered Hasting who informed him that Junebug was unable to meet until 3:30 p.m. When Junebug finally arrived, he informed Powell that the cocaine would be delivered momentarily. While they waited, Powell asked Graham the price of three-quarters of a pound of cocaine. Graham responded "About 63", meaning $6,300. Subsequently, Wilhoite appeared a few minutes later and advised Powell that "they" wanted Powell's drug deals conducted strictly through her, Wilhoite, and that the "dude" paid her for her involvement, that "Bobby said they don't deal with anyone they don't trust," and that the "dope" was on its way. This transaction, however, was never completed and the USPS subsequently terminated Powell as an informant.
 
 
 7
 During a consensual search of Hasting's apartment conducted subsequent to his arrest, the officers discovered a personal phone book which listed the number of a pager with the notation "Bug" next to it. The pager had been leased by Graham and issued to "Dennis Jones." The automobile which Graham had driven during one of the drug transactions was also registered to a Dennis Jones.
 
 
 8
 At trial, Postal Inspector Michael McCarran (McCarran) testified for the government. While examining the witness, Graham's counsel questioned McCarran about the Postal Crime Lab's expertise in the field of comparative voice exemplars:
 
 
 9
 Q: Have you ever encountered the use of voice exemplars in the course of your investigative work?
 
 
 10
 A: No. Not during my work.
 
 
 11
 Q: Are you familiar with that practice?
 
 
 12
 A: I guess I can say, probably the jury can say, I've seen it on TV, but I haven't done it personally.
 
 
 13
 Q: All right.
 
 
 14
 A: I would like to hear Mr.--
 
 
 15
 THE COURT: No. Just answer the questions. No. She asks and you answer them and they listen and I rule on them. We all got a job to do.
 
 
 16
 THE WITNESS: Yes, Sir. Yes, Sir.
 
 
 17
 MS. FREEMAN: That's the conclusion of my questions of Mr. McCarran, but I move for a mistrial on the basis of the witness commenting on Mr. Graham's not having taken the stand.
 
 
 18
 The court initially declared a mistrial. However, upon rehearing the motion the following day, the court denied the motion finding that the jury would not necessarily reach the conclusion that the witness had been commenting on Graham's failure to testify at trial. The court then instructed the jurors to disregard McCarran's controversial testimony and reminded them that the defendant had a constitutional right not to testify and that no finding of guilt or implication of guilt could arise as a result of the defendant's failure to testify or offer any evidence.
 
 
 19
 At trial, the government offered tape recordings of the drug transactions between Powell and the defendants. Before the tapes and typewritten transcripts were presented to the jury, the district court had listened to the tapes to determine audibility. The court excluded one tape because it was totally inaudible. Further, the court advised that the audible tapes would be accepted as the best evidence of the conversations and the typewritten transcripts would be used merely to aid the jury in tracking the recorded conversations.
 
 
 20
 When the government offered the tape recording of the December 11, 1990 conversation between Hasting and Powell into evidence and the corresponding typewritten transcript, Hasting's defense counsel objected to the authenticity of the transcript. The court thereupon conducted a voir dire examination of witness Powell to determine authentication of the typewritten transcript. Powell testified that he had reviewed the transcript, listened to the tape, and that the typewritten transcript accurately identified the speakers and the content of the conversation. Accordingly, the court concluded that the typewritten transcript had been properly qualified for its limited use by the jury.
 
 
 21
 Before the jurors received the typewritten transcripts of the tape recordings, the court instructed them that the tapes alone were the best evidence of the conversations between the parties and that the transcripts were to be used only as an aid to track the recorded conversations. The jury returned the transcripts to the Marshall after the government finished playing the tapes.
 
 
 22
 On July 26, 1991, the jury found Graham guilty on counts one and five and not guilty on count six. Defendant Hasting was found guilty on count one. On October 16, 1991, defendant Hasting was sentenced to 33 months imprisonment followed by a three year period of supervised release. He timely filed his notice of appeal on October 17, 1991.
 
 
 23
 On October 29, 1991, Graham was sentenced to 41 months imprisonment on count six and 36 months on count one, to run concurrently. He also received a six year term of supervised release on count six and three years on count one, to run concurrently. Prior to sentencing, defendant Graham objected to the probation officer's assessment of his relevant conduct because the probation officer, in arriving at that assessment, had included the 26.26 grams of cocaine which was the substance of count six of the indictment, the count that he had been acquitted of violating. The court rejected Graham's argument concerning his evaluated relevant conduct and found by a preponderance of the evidence that he had been the supplier of the drug conspiracy. The court further concluded that the amount of cocaine asserted in the count of which defendant had been acquitted constituted relevant conduct for sentencing purposes, reflecting a total offense level of 19 and sentencing range of 33 to 41 months. Graham timely filed his notice of appeal on November 4, 1991.
 
 
 24
 In his first assignment of error, defendant Hasting charged that the evidence was insufficient to support the jury's verdict convicting him of conspiring to distribute and possess with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). The standard of review for claims of insufficient evidence is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). To sustain a conviction of conspiracy involving drugs, the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join and participated in the conspiracy. United States v. Pearce, 912 F.2d 159, 161 (6th Cir.1990), cert. denied sub nom. Thorpe v. United States, 111 S.Ct. 978 (1991). Once a conspiracy has been proven, however, only slight evidence is necessary to implicate a defendant. United States v. Gresser, 935 F.2d 96, 101 (6th Cir.), cert. denied sub nom. Singer v. United States, 112 S.Ct. 239 (1991).
 
 
 25
 The evidence in the instant action was sufficient for a jury to conclude beyond a reasonable doubt that a conspiracy to possess and distribute cocaine existed and that defendant Hasting participated in the conspiracy. During Powell's conversations with Wilhoite, Wilhoite referred to a man named "Bobby" when discussing the purchase of cocaine. Moreover, Hasting had arranged a meeting between Powell and Junebug-Graham for the purpose of conducting a drug transaction. When Junebug left the meeting with Powell, Wilhoite returned and stated that "Bobby said they don't deal drugs with anyone they don't trust." Finally, Hasting possessed a personal phone book containing the number of a pager, which was rented by Graham, with the name "Bug" noted next to it.
 
 
 26
 Hasting's second assignment of error is equally misconceived. He unartfully charged that the tape recording and corresponding typewritten transcript of the December 11, 1990 conversation between Powell and Hasting had not been properly authenticated. Pursuant to Federal Rule of Evidence 901(b)(5), he first claimed that the government had failed to authenticate the tape recording. Since Hasting failed to assert this objection at trial, this court may reverse the verdict only if the alleged erroneous admission of evidence amounted to plain error. Fed.R.Evid. 103(d). Rule 901(b)(5) provides that a witness may identify or authenticate the voice or speaker on a tape if he has heard "the voice at any time under circumstances connecting it [the voice] with the alleged speaker." Both Powell and Driscoll, who had heard the recorded conversations first hand, testified to the identity of the speakers recorded on the tape. Accordingly, the admission of the tape did not violate Rule 901(b)(5).
 
 
 27
 Hasting next asserted that the court abused its discretion when it permitted the jury to use the transcript as an aid while listening to the tape recording of the December 11, 1990 meeting. In the instant action, Powell testified out of the presence of the jury that he had listened to the tape and that the transcript accurately reflected the content of the conversations and the identity of the speakers. See Fed.R.Evid. 901(a) ("The general requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); United States v. Robinson, 707 F.2d 872, 877 (6th Cir.1983). The court thereupon concluded that the transcript was accurate and instructed the jury to use the transcript as an aid rather than as evidence. Accordingly, the court did not abuse its discretion when it allowed the jury to refer to the transcript while listening to the corresponding tape recording.
 
 
 28
 Defendant Graham asserted on appeal that the district court erred when it denied his motion for a mistrial because his privilege against self-incrimination was violated by McCarran's comments at trial. In determining if a defendant's privilege against self-incrimination has been violated, the court must consider the following factors: 1) Were the comments "manifestly intended" to reflect the accused's silence or of such a character that the jury would "naturally and necessarily" take them as such; 2) Were the remarks isolated or extensive; 3) Was the evidence of guilt otherwise overwhelming; and 4) What curative instructions were given and when. Bagby v. Sowders, 894 F.2d 792, 798 (6th Cir.), cert. denied, 496 U.S. 929 (1990) (reinstating portion of vacated decision, Bagby, 853 F.2d 1340, 1347 (6th Cir.1989)). See Lundy v. Campbell, 888 F.2d 467, 478 (6th Cir.1989), cert. denied, 495 U.S. 950 (1990).
 
 
 29
 In the instant action, McCarran stated during cross-examination that "I would like to hear Mr.--" in response to the defense attorney's inquiry concerning voice comparisons. The court properly determined that the jury could not necessarily have reached the conclusion that the witness had been commenting upon the defendant Graham's failure to testify at trial. Furthermore, the comment was isolated and the evidence of guilt was overwhelming as to Graham. Finally, the court had given a curative instruction to the jury concerning any implications that may have arisen from defendant's controversial cross-examination of McCarran. Accordingly, the court did not abuse its discretion when it denied defendant Graham's motion for mistrial.
 
 
 30
 Graham's final assignment of error is equally without merit. He asserted that the district court erred when it included as relevant conduct the 26.26 grams of cocaine charged in the acquitted count of the indictment. An acquittal does not bar a sentencing court from considering the acquitted conduct in imposing a sentence. United States v. Moreno, 933 F.2d 362, 374 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991). Application note one to United States Sentencing Guidelines section 1B1.3 provides that the conduct for the defendant includes conduct of others in furtherance of the execution of the "jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." The trial court concluded that Graham had been the cocaine supplier for his co-defendants, and therefore, he was responsible for the amounts of cocaine distributed by his co-defendants as part of the conspiracy. There is ample evidence in the record to support the court's factual finding. Accordingly, the trial court's decision to include the amount of cocaine from the acquitted count was not clearly erroneous.
 
 
 31
 After reviewing the record in its entirety and the briefs and arguments of counsel, the district court's disposition in the instant case is hereby AFFIRMED.
 
 
 
 [1]
 Wilhoite pleaded guilty to the conspiracy and one substantive count of distribution or possession with the intent to distribute cocaine within 1,000 feet of a school