67 F.3d 300
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Peter MATHIS, Defendant-Appellant.
 No. 95-5042.
 United States Court of Appeals, Sixth Circuit.
 Oct. 2, 1995.
 
 Before: MILBURN, GUY, and SUHRHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 Peter Mathis was convicted by a jury of assault of a postal employee with the intent to rob the employee of mail matter, money or other property of the United States. 18 U.S.C. Sec. 2114.
 
 
 2
 On appeal, defendant argues that the evidence presented at trial was insufficient to prove he intended to rob the postal employee of mail matter. Our review of the record convinces us the evidence was insufficient, and we reverse.
 
 I.
 
 3
 On August 4, 1993, Joyce Jackson, a postal employee, was working in Memphis, Tennessee. At 3:00 p.m., near the end of her shift, she had parked her postal vehicle at Manor Lake Elementary School and was taking her afternoon break. Since it was summer, the school yard area was largely deserted.
 
 
 4
 Jackson had her window open and was reading a magazine when "a man came up ... and ... asked [her if she had] his check." (App. 80.) Jackson testified that her response was: "I asked him where did he live. And he pointed out this area and I told him that I don't deliver over there and I told him I was finished delivering anyway and I didn't have his check." (App. 80.)
 
 
 5
 Jackson was not alarmed at this point nor did she find the question about the check unusual. On cross-examination, she testified as follows:
 
 
 6
 [Q.] ... Do you often have people approach your vehicle asking you about mail?
 
 
 7
 A. I have people come up to me all of the time trying to get their mail and trying to get their checks early and always saying they have to go out of town or they are not going to be at home and could I give them their check ahead of time before I get to their house.
 
 
 8
 Q. Did it startle you when the defendant came up and asked for his mail?
 
 
 9
 A. No, that was normal to me.
 
 
 10
 (App. 100.)
 
 
 11
 After telling Mathis she did not have his check, Jackson returned to reading her magazine. At this point in time, Mathis touched her on the arm "called [her] a bitch and ... told [her] that he had a gun in [the] sack that he touched [her] arm with." (App. 80.) Jackson felt something hard in the bag and believed it was a gun. What happened next was described by Jackson as follows:
 
 
 12
 And he told me that he wanted me to suck his dick and he would shoot me if I didn't do what he told me to. And so he told me to let him in the vehicle. And I had to scoot up because he slid in between me and the seat. And I let him in the vehicle and he stood right behind the shelf of the vehicle. It is like a doorway. He stood in the doorway and squatted down and he told me to drive.
 
 
 13
 (App. 80-81.)
 
 
 14
 After forcing Jackson to drive to a nearby secluded area, the defendant, in Jackson's words, "asked me to come into the back of the vehicle and he told me that he wanted--he wanted--he wanted to go down on me and he made me take off my pants. And he performed oral sex on me." (App. 81.)
 
 
 15
 Subsequently, Mathis took Jackson's wallet and rings, and, as Jackson recounted it at trial:
 
 
 16
 [H]e told me he wanted me to meet him somewhere else so he could have sex with me because he couldn't have sex in a vehicle because it was too hot. And he told me that he would give me my rings and my money back, plus he would give me fifty dollars more if I met him over at the school where I originally met him at.
 
 
 17
 Q. Did you agree to do that?
 
 
 18
 A. Yeah. I told him yeah, I told him anything, you know, so that he wouldn't hurt me.
 
 
 19
 (App. 87-88.)
 
 
 20
 Mathis then ordered Jackson to drive him to a location a short distance away where he exited the truck and left. Jackson immediately returned to the post office and reported the incident. Mathis went home and had a friend drive him to a pawn shop, where he pawned the rings he had taken from Jackson.
 
 
 21
 A few days later, Mathis was arrested and more or less admitted taking the money and rings, but denied any attempt to take mail or checks. He also told the postal investigators that he had been having an affair with Jackson, who was married, and whatever sex occurred was not only consensual, but also at her request. Mathis, despite a prior criminal record, testified on his own behalf at trial, and recounted in great detail his alleged prior relationship with Jackson, as well as numerous other amorous exploits in which he had been involved. Mathis also called as witnesses his sister and a former girlfriend, who loosely supported his version of his prior relationship with Jackson, although the credibility of both of these witnesses was damaged on cross-examination.
 
 
 22
 After the government rested, defense counsel made a Fed.R.Crim.P. 29 motion for a judgment of acquittal. Counsel argued:
 
 
 23
 We submit to the Court that a reasonable trier of fact in this case considering the evidence in the light most favorable to the government would not be able to find from the facts that have been presented in this case that there was [sic] intent to rob this lady of any mail matter or property, or anything belonging to the United States.
 
 
 24
 Considering the facts that have been presented in this case, number one, here a lady that says she was sitting in her mail truck reading a magazine when an individual came up and said, "Do you have my check?" "No, I have finished delivering all of the mail." At this time--this is her testimony--that this person forced their way into the truck. That even before this person got into the truck that there was an encounter made for her to perform of fellatio, or oral sex, on this individual, and that when he drove to this designated location that the thing that was on this person's mind was sex with this individual from the facts that have been presented in this case. There has been no testimony at no time that this man rummaged around in the truck. She said in my cross examination of her is that, "Oh, yeah, I had a little mail, mail that I had picked up on my route." At no time did she ever say he looked through any of this mail.... At most here what we have is a state robbery and a rape or a sexual assault.
 
 
 25
 (App. 145(a)-145(b).)
 
 
 26
 After hearing from the government in opposition, the trial judge denied the motion and stated:
 
 
 27
 [THE COURT]: Because of defense opening statement that indicated to the jury that they ought to be careful to watch for proof as to all three elements, I have been careful to watch for that proof. It is not the strongest in the world, I agree, but given the fact that the jury can consider all of the circumstances involved, I think that there is enough that a reasonable juror can conclude that the defendant assaulted this woman with the intent to rob her of mail matter, money, or other property of the United States. It is equally arguable that all he was interested in was sex. But he asked for checks in the first instance at a location not on his route. He indicated he had a weapon. Once he got in the truck, he did ask what other mail she had and were there any checks in there. And he did eventually, according to the government's proof, take money from the carrier, all of which taken in combination are sufficient in this Court's mind to allow a reasonable juror to conclude that he had the intent to rob the carrier of mail matter or money in the custody of the United States.
 
 
 28
 (App. 145(d)-145(e).)
 
 II.
 
 29
 The government concedes that threatening Jackson with a firearm, the sexual assault and the robbery of her wallet and rings would not support the conviction unless defendant also had the intent to steal mail matter. Similarly, defendant concedes, for the purposes of argument anyway, that Jackson was in lawful possession of mail matter and that Mathis did assault her. Thus, the entire case turns on Mathis' intent.
 
 
 30
 Intent is a question of fact to be decided by the jury. There is seldom direct evidence of a person's intent, and intent must be deduced from all of the surrounding circumstances. In determining whether the evidence of intent was sufficient, our review standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found [intent] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Furthermore, a finding of guilt may be based entirely on circumstantial evidence and such evidence need not remove every hypothesis except that of guilt. United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989).[1]
 
 
 31
 That being so, however, we nonetheless conclude that no reasonable juror, from the evidence in the record, could have concluded that Mathis had the intent to assault Jackson for the purpose of stealing mail matter. Jackson herself testified that, when Mathis approached her and was outside her vehicle, he asked if she had his check. She stated this inquiry did not alarm her as it was a common one in the neighborhoods where she delivered mail. Furthermore, she told Mathis she had completed her deliveries.
 
 
 32
 In this regard, the district judge, in denying the motion for judgment of acquittal, made two questionable statements. He stated that "he [Mathis] asked for checks ... at a location not on his route." (App. 145(e).) There is nothing in the record, however, to indicate that Mathis would have any way of knowing whether Jackson was his carrier or not or where his postal route started or ended. The trial judge also stated: "Once he [Mathis] got in the truck, he did ask what other mail she had and were there any checks in there." (App. 145(e).) There is no record support for this later statement, and to the degree it constitutes a finding of fact, it was clearly erroneous.
 
 
 33
 The government attempts to bottom its argument on the court's misstatement, but offers no more record support for this proposition than did the trial judge. The government directs us to only one transcript reference, which reads:
 
 
 34
 Q. Let me ask you about that Ms. Jackson. Did he ask you about the mail in the truck or if there was any mail once he got into the truck?
 
 
 35
 A. Yeah. When we were at the school, he asked me was there any checks in the mail and I told him that I was finished delivering and the only mail that I had was the mail I had collected from the route.
 
 
 36
 (App. 83-84.)
 
 
 37
 Although the government's compound question did include a reference to Mathis' asking "if there was any mail once he got into the truck," the defendant's answer, when read in context with her earlier testimony could only reasonably be interpreted to mean that Mathis' questioning about "his checks" occurred before he entered the truck. Everything that occurred after Jackson told Mathis she did not have his checks was in the context of a coerced sexual encounter. The mail never came up again nor was there even a reference to Mathis rummaging around the truck to see what he could find. The only property he went after was Jackson's purse, which clearly was not the property of the United States Postal Service.
 
 
 38
 For the first time on appeal, the government also argues that by "commandeering" the postal truck, Mathis stole "property of the United States." This theory, however, was never presented to the jury either in argument or by way of instructions, and could not be the basis upon which the jury reached a guilty verdict.
 
 
 39
 It is always difficult, when the overall conduct of a defendant has been reprehensible, to reverse a conviction on what some might view as a technicality. We do not, however, view the failure to prove an essential element of the offense as a technicality. It is very understandable how the jury was driven to its guilty verdict given the sympathy for Jackson, which would have been generated by her testimony, coupled with the cavalier attitude and arrogance exhibited by Mathis when he testified. Since his general intent was evil, it would be easy enough for a jury to use that as a surrogate for the specific intent required for this offense. Our task is to not make that same error.
 
 
 40
 REVERSED and REMANDED.
 
 
 
 [1]
 Although earlier case law from this circuit suggests to the contrary, see, e.g., United States v. Leon, 534 F.2d 667, 677 (6th Cir.1976), it is clear that the current law in this circuit is that "circumstantial evidence standing alone may sustain a conviction so long as the totality of the evidence was substantial enough to establish guilt beyond a reasonable doubt." United States v. Phibbs, 999 F.2d 1053, 1064 (6th Cir.1993), cert. denied, 114 S.Ct. 1071 (1994)