NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0180n.06

Case No. 21-4197

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 21, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| JURMAINE A. JEFFRIES, | ) | |
| Defendant - Appellant. | ) | O P I N I O N |
| | ) | |

Before: SUTTON, Chief Judge; LARSEN and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This case arises from a fatal drug overdose in connection with Defendant-Appellant Jurmaine Jeffries' distribution of fentanyl. A jury found Jeffries guilty of one count of distributing a controlled substance that caused the fatal overdose, and one count of possessing with intent to distribute a controlled substance. Jeffries now appeals the district court's denial of his motion for a judgment of acquittal as to the distribution count and the related death-results enhancement. For the reasons stated below, we **AFFIRM**.

I.

On September 16, 2015, a woman called 911 at approximately 3:45 p.m. to report that she believed her adult daughter, J.H., had overdosed on heroin in their home in Akron, Ohio. When officers from the Akron Police Department arrived at J.H.'s home, they proceeded to the attic where she was lying unresponsive. Near J.H., they found at least 50 hypodermic needles; plastic

bags filled with over 200 unknown pills; a bagged, unknown brown substance, later identified as fentanyl; and other drug paraphernalia. Officers also searched J.H.'s cell phone and found the following text messages transmitted the same day between J.H. and Jeffries:

| From J.H. to Jeffries | |
|---|---|
| 6:47 a.m. | Need 2 Gs ASAP |
| 10:21 a.m. | R u ok? I don't have a lot of time left 4 this 1. |
| 10: 23 a.m. | Got limited time C. |
| 10:27 a.m. | Limited time Can't lose it. |
| 10:58 a.m. | Please soon they're thinking I'm not going to make it good don't wait much longer. |
| 11:15 a.m. | Didn't understand what t said when you called earlier. |
| From Jeffries to J.H. | |
| 12:27 p.m. | B there shortly |

J.H. had attempted to contact Jeffries 18 times that morning and apparently spoke to Jeffries on the phone a few times, including at least twice between 2:37 p.m. and 2:47 p.m. Moreover, based on cell phone records, Jeffries was in the general vicinity of J.H.'s house during that same time frame. Several hours after the 911 call, an officer sent Jeffries a text message from J.H.'s cell phone, posing as J.H., to arrange a controlled purchase of heroin. The text message read, "Need two more G ASAP." Jeffries responded, "Separate?" and the officer responded affirmatively. With officers set up at various surveillance points near J.H.'s home, police arrested Jeffries when he arrived on the scene. On searching his person and car, officers uncovered $446 in cash, three cell phones, two small bags of an unknown substance, and one larger bag containing the same substance. Laboratory testing identified the bagged substance as containing fentanyl.

A grand jury subsequently returned a two-count indictment against Jeffries. Count I alleged that he distributed fentanyl in violation of 28 U.S.C. §§ 841(a)(1) and (b)(1)(c), and included an enhancement pursuant to § 841(b)(1)(c) alleging that he distributed the fentanyl that caused J.H.'s death. Count II alleged that he possessed fentanyl with the intent to distribute in violation of §§ 841(a)(1) and (b)(1)(c). Jeffries proceeded to trial.

At trial, two medical experts testified that they found lethal levels of fentanyl in J.H.'s blood and urine. Toxicologists could not determine whether she took the fatal dose intravenously or by swallowing or snorting a crushed or whole pill. However, a medical examiner testified that J.H. did not have any residual powder under her nose, and that the "numerous fresh and healing needle puncture marks" on J.H.'s body "indicate[d] intravenous drug use." Regarding the source of the fatal dose, a forensic investigator testified that there is no scientific method for determining whether two separately packaged bags of fentanyl were derived from the same batch. In other words, testing could not confirm whether J.H.'s fatal dose came from the same batch as the fentanyl that officers recovered from Jeffries during his arrest. But a state detective testified that the substance in the bag found in J.H.'s attic was the same "size, shape, consistency, [and] color" as the substance officers seized from Jeffries. The detective also testified that the drugs and paraphernalia in J.H.'s attic indicated "extensive chronic abuse."

Evidence further revealed that no one tested the pills or the substance found on the drug paraphernalia recovered from J.H.'s attic. Instead, the state detective identified the substances contained in all but two of the pills by calling poison control and describing the color, size, and markings on the pills. The jury also learned that Jeffries lived about three miles away from J.H., but cellular towers placed Jeffries closer to J.H.'s home between 2:37 p.m. and 2:42 p.m., about an hour before J.H.'s mother found her unresponsive. The cellular towers placed Jeffries in the

same location 45 minutes after the officer texted him from J.H.'s phone to facilitate the controlled buy, and only a couple of minutes before officers arrested him at the meeting location. Additionally, phone records indicated that J.H. and Jeffries were both in contact with an unidentified person the morning of her death, but the government did not investigate that third party. Ultimately, the jury returned a guilty verdict on both counts, and further found that death resulted from the use of fentanyl distributed by Jeffries.

Pursuant to Federal Rule of Criminal Procedure 29, Jeffries moved for a judgment of acquittal after the close of the government's evidence and again after the close of all evidence. In particular, he challenged the sufficiency of the evidence as to Count I and the death-results enhancement. The district court initially reserved its ruling but eventually denied Jeffries' motion following the guilty verdict.[1] Jeffries now appeals.

II.

We review de novo both motions for a judgment of acquittal and challenges to the sufficiency of evidence. *United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015). The pertinent question for claims of insufficient evidence is whether "any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. Sumlin*, 956 F.3d 879, 891 (6th Cir. 2020) (quoting *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998)). This inquiry places a heavy burden on the defendant, as "we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor." *Id.* (quoting *Maliszewski*, 161 F.3d at 1005). "We [also] draw all available inferences and resolve all issues of

---

[1] Jeffries also filed a motion for a new trial which was ultimately denied and is not relevant to the present appeal.

credibility in favor of the jury's verdict, and it is not necessary for us to exclude every reasonable hypothesis but guilt." *Id.* (quoting *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)).

To prevail on a death-results enhancement pursuant to § 841(b)(1)(c), the government must prove: (1) Jeffries knowingly or intentionally distributed a controlled substance; and (2) that controlled substance was the but-for cause of J.H.'s death. *Burrage v. United States*, 571 U.S. 204, 210 (2014). "But-for causation occurs when the distributed drug combines with other factors to produce death, and death would not have occurred without the incremental effect of the controlled substance." *United States v. Simer*, 835 F. App'x 60, 65 (6th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015)). Importantly, a guilty verdict on a death-results enhancement will not survive a challenge to the sufficiency of evidence where there is an "unexplained gap in the [government's] evidence." *United States v. Ewing*, 749 F. App'x 317, 329 (6th Cir. 2018). Yet, "we are . . . mindful that circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994) (internal quotation marks omitted) (quoting *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)).

In this vein, we have found the evidence insufficient to support a death-results enhancement where the government failed to explain a gap in the evidence that it presented to prove that the defendant sold the drugs that caused the death. *Ewing*, 749 F. App'x at 329–30. The evidence in *Ewing* was sufficient to establish that the defendant distributed drugs to the victim where the government introduced text messages from the victim expressing interest in buying drugs from a phone number later linked to the defendant; the two men discussed price, quantity and a meeting place in the text messages; the victim informed the defendant that he made a stop

for cash enroute, which was later corroborated by atm records; and the defendant later warned the victim about the potency of the drugs. *Id.* at 327. The evidence was also sufficient to support fentanyl overdose as the cause of death. *Id.* at 328. However, the defendant identified an unexplained gap in the government's theory that he sold a mixture of heroin and fentanyl to the victim, which caused the overdose several hours after the victim took the mixture. *Id.* at 329. While the evidence revealed that fentanyl was a but-for cause of the victim's death, nothing in the record established that he had also used heroin—i.e., the other drug contained in the mixture—in the several hours preceding his death. *Id.* Indeed, heroin was only present in the victim's urine, which indicated historical use; it was not present in the victim's blood, which would have revealed recent use according to the government's experts. *Id.* Therefore, "the absence of heroin or heroin metabolites in [the victim's] blood and the lack of any evidence or testimony to explain its absence [left] us unable to conclude that the jury's verdict as to the death results enhancement [was] supported by sufficient evidence." *Id.* at 330.

Perhaps predictably, we reached the opposite conclusion in cases where the defendant failed to poke holes in the government's evidence regarding the death-results enhancement. For instance, the defendant in *United States v. Davis*, 970 F.3d 650, 658 (6th Cir. 2020) argued that the evidence did not establish causation because the victim received the fatal drugs from someone to whom the defendant sold the drugs, rather than directly from the defendant himself. In finding the evidence sufficient, we explained that a rational juror could find that the victim took the drugs that the defendant distributed to a middleman, given the middleman's testimony that he received the drugs from the defendant and shared them with the victim. *Id.* Phone and cell-site data also corroborated this testimony. *Id.* We further explained that the coroner's finding that fentanyl was

the but-for cause of death based on the fentanyl found in the victim's blood was sufficient to support a rational juror's finding of but-for causation. *Id.*

Likewise, we found the evidence sufficient to sustain a death-results enhancement in *United States v. White*, No. 21-1417, 2022 WL 3643324, at \*3 (6th Cir. Aug. 24, 2022). There, regarding the question of knowing and intentional distribution, the defendant argued that the government had not shown that he distributed the fatal dose, as he sold heroin, but the evidence revealed the cause of death as fentanyl. *Id.* We rejected this argument because, irrespective of what the defendant and/or the middleman who bought from him thought the defendant was selling, evidence suggested that the defendant in fact sold fentanyl to a middleman who in turn sold to the victim and her boyfriend. *Id.* In reaching this conclusion, we looked to evidence establishing that the victim's boyfriend warned her that the defendant's drugs were unusually strong, officers recovered pure fentanyl from the victim's apartment, and the defendant possessed pure fentanyl when he arrived at a controlled buy for the "same" deal that the defendant previously gave to the middleman. *Id.* With respect to causation, the defendant argued that the government had not shown that fentanyl caused the victim's death because other drugs were also detected in her system. *Id.* at \*4. This argument failed because the victim's fentanyl levels were lethal compared to other substances in her body, and medical experts testified that fentanyl was the cause of death. *Id.* While it was true that the victim "had a variety of substances in her system when she died," it was the jury's role—and not the court's—to weigh the witness testimony regarding the cause of death. *Id.* (citing *Volkman*, 797 F.3d at 394).

### III.

Jeffries argues that the government's evidence fails to prove that: (1) Jeffries distributed drugs to J.H., to support the distribution count and the death-results enhancement; and (2) J.H.

kept and used the drugs that she received from Jeffries, as required to establish causation for the death-results enhancement. Each of these arguments fails.

First, a rational juror could find that Jeffries distributed fentanyl to J.H. on the day of her death. Just as the context of the text messages was sufficient to establish that the defendant distributed the drugs in *Ewing*, so too is the context of the messages between J.H. and Jeffries. There, we looked to the victim's expressed interest in buying the drugs; the discussions about price, quantity and a meeting place; the victim's whereabouts around the time of the buy; and the messages following the drug deal. *Id.* at 327. Here, J.H. sent Jeffries a text message at 6:47 a.m. on the morning of her death saying that she "need[ed] 2 Gs ASAP." She then sent him five more text messages within the next several hours following up on her request. At least one of the messages indicated that she spoke to Jeffries on the phone during that time. In particular, one of the messages read, "Didn't understand what T said when you called earlier." Officers also found a text message from Jeffries in J.H.'s phone that read, "be there shortly" at 12:27 p.m., about 3 hours before her mom called 911. Additionally, cell tower data placed Jeffries near J.H.'s home between 2:37 p.m. and 2:42 p.m., about an hour before the 911 call. Jeffries was connected to this same cell tower minutes before officers arrested him at the meeting place for the controlled buy in which an officer posing as J.H. requested "two more G ASAP,"—i.e., two more of what Jeffries distributed to J.H. earlier that day. Officers also recovered $446 in cash, three cell phones, two small bags of fentanyl, and one larger bag of fentanyl from Jeffries during the arrest. This evidence supports a finding that Jeffries was selling drugs and had prepared two separate bags of the substance he sold to J.H. earlier, just as the officer requested in the text message sent from J.H.'s phone. And considering the evidence as a whole, viewed in favor of the government and the

verdict, it is enough for the jury to conclude that Jeffries distributed fentanyl to J.H. on the day of her death.

Jeffries raises several unpersuasive counter arguments. He contends that the number and tone of messages suggest only that J.H. was interested in purchasing drugs, but "leaves open" whether the transaction was complete. Jeffries further maintains that J.H. was a drug addict and evidence revealed that she may have been in contact with multiple other drug dealers who could have distributed the fentanyl. He also points to the government's failure to test all the drugs and drug paraphernalia found in J.H.'s attic to confirm their source. But these arguments simply call into question whether the government introduced any direct evidence that the distribution occurred or eliminated all other reasonable theories as to who could have distributed the fentanyl. We do not require the government to make such showings for the death-results enhancement to apply. *See Ellzey*, 874 F.2d at 328 ("[C]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984))). Further, Jeffries mentions in his opening brief that while cell tower data suggested that he was near J.H.'s home the day of her death, the evidence showed that he only lived about three miles away from J.H. But to the extent Jeffries intends to argue that the proximity of his and J.H.'s homes casts doubt on the cell tower data, the jury heard testimony from a special FBI agent explaining why the tower in question would have only detected Jeffries' location from J.H.'s home and not Jeffries' home. It is not our place to substitute our own credibility determinations for that of the jury. *Volkman*, 797 F.3d at 394; *United States v. Assfy*, No. 20-1630, 2021 WL 2935359, at *5 (6th Cir. July 13, 2021) ("[W]e do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." (internal quotation marks omitted) (quoting *Ray*, 803 F.3d at 262)).

Second, regarding causation, a rational juror could find that J.H. kept and used the fentanyl that she received from Jeffries. The government offered evidence that J.H. kept at least some of the drugs that she purchased from him. In particular, a state detective testified that the substance officers recovered from J.H.'s room was the same "size, shape, consistency, [and] color" as the bagged substance found in Jeffries' possession. And a forensic investigator testified that it was not possible to determine by other means whether the fatal dose and the substance recovered from Jeffries during the arrest came from the "same batch." Furthermore, there were over 200 pills in the attic, but the state detective worked with poison control to identify all but two of the pills and none of them were fentanyl. Even if any of the pills had contained fentanyl, a medical examiner testified that J.H. did not have any powder residue on her nose to indicate that she crushed and snorted a pill containing the fatal dose; instead, the "numerous fresh and healing needle puncture marks" on J.H.'s body "indicate[d] intravenous drug use." Investigators also found lighters, a burnt spoon and several needles in the attic, and the government offered evidence to show that these items are indicative of intravenous drug use. This circumstantial evidence would permit a rational juror to find that J.H. took the fentanyl that she received from Jeffries intravenously. The government was not required to disprove the hypothesis that J.H. could have swallowed a pill containing fentanyl. *See Ellzey*, 874 F.2d at 328.

Jeffries also maintains that the tone and context of the text messages indicate that J.H. was "middling" or facilitating a purchase of drugs for someone else. The government argues, and we agree, that whether the text messages suggest that J.H. was "middling" a transaction does not undercut that she used the drugs for herself. Jeffries tries to distinguish this case from cases like *Simer*, 835 F. App'x at 65 where eyewitnesses confirmed that the victim took the drugs that the defendant distributed. It is true that eyewitnesses can be helpful for the government in cases where

the victim did not take the drugs alone. *See id.* ("[The victim's boyfriend] testified that he and [the victim] consumed the drugs received from [the defendant.]"); *White*, 2022 WL 3643324, at *1 (evidence revealed that the victim took the drugs with her boyfriend, who in turn helped the government facilitate a controlled buy with the defendant). However, we have not required eyewitness evidence where, as here, the victim took the drugs alone. *See Sumlin*, 956 F.3d at 892 (finding evidence that drug transaction occurred sufficient to suggest that the victim took the drugs). And in *Ewing*, the evidence was insufficient to link the defendant's drugs to the victim's fatal dose, but even then, we did not hold or imply that eyewitness testimony was required. 749 F. App'x at 329. Indeed, such a requirement would place a nearly insurmountable burden on the government in cases where victims did not take drugs with at least one other person. Rather, we found the evidence insufficient to explain the gap in *Ewing* because the type of drug the defendant sold was not detected in the victim's blood. *Id.* Jeffries points to no such gap.

Finally, Jeffries cites *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997) to argue that "the jury had to impermissibly stack inferences thereby creating 'facts' that were not present." This argument is misplaced. In *Lecureux*, we explained that it is not helpful to the jury to hear an opinion as to an ultimate issue that a witness reached by stacking inference upon inference. *Id.* That case speaks to a limitation of inferences by witnesses, not juries. It is well-settled that "[c]ircumstantial evidence alone is sufficient to sustain a conviction." *United States v. Lowe*, 795 F.3d 519, 522–23 (6th Cir. 2015); *see also United States v. Garcia*, 758 F.3d 714, 722 (6th Cir. 2014) ("Although [the defendant's] conviction required the triers of fact to accept the chain of inferences that the United States posited at trial, each of those inferences is reasonable and supports [the defendant's] conviction.").

Accordingly, Jeffries cannot establish that the government's evidence was insufficient to sustain a guilty verdict as to the distribution count of his indictment and the related death-results enhancement.

IV.

For the reasons stated above, we **AFFIRM** the district court's judgment.