RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RUSSELL DAVIS,

*Defendant-Appellant.*

No. 19-3094

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:16-cr-00260-1—Christopher A. Boyko, District Judge.

Argued: June 17, 2020

Decided and Filed: August 14, 2020

Before: GILMAN, KETHLEDGE, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Dennis C. Belli, Columbus, Ohio, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Dennis C. Belli, Columbus, Ohio, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

MURPHY, Circuit Judge. Federal drug laws impose enhanced sentences if a "death results" from the use of the drugs that a defendant distributes. This "death-results" enhancement led the district court in this case to impose a life sentence on Russell Davis. Davis sold drugs that were later shared with Jacob Castro-White, who tragically died of a fentanyl overdose.

Davis argues that the enhancement does not apply because he did not sell drugs directly to Castro-White. The enhancement's text, however, does not require such a buyer-seller relationship with the victim. We also reject Davis's other evidentiary and instructional claims.

At the same time, Davis raises a valid challenge to the warrant that allowed the police to search his home and seize his cellphone. The government now concedes that the affidavit supporting this warrant lacked probable cause. But the government asserts that the affiant gave additional unrecorded oral testimony to establish probable cause in front of the state magistrate who issued the warrant. The Fourth Amendment does not mandate recorded testimony, so we will allow the government to offer evidence of this additional testimony in an evidentiary hearing on remand. We thus deny most of Davis's claims, but remand for limited proceedings on this Fourth Amendment issue.

I

Jacob Castro-White was an avid bodybuilder living in Lorain, Ohio. Many of the 23-year-old's friends and family knew that he used steroids and protein powders. Some knew that he used other substances, like thyroid medications, to further enhance his appearance. And some knew that he smoked marijuana and used cocaine. But Castro-White concealed his abuse of opiates from all but a few friends. His mother was thus blindsided when she discovered her young son dead in his bedroom on the morning of March 7, 2016.

A first responder observed drug paraphernalia in Castro-White's room: needles, a spoon, and a silver wrapper containing a white powdered substance. Castro-White also had a "foam cone" covering his mouth, an all-too-common sign of an opiate overdose. The responder called Detective Ernest Sivert of the Lorain Police Department to the scene. Sivert retraced Castro-White's final hours through cellphone data and interviews with friends—including, most importantly, Zaharias ("Harry") Karaplis and Corey Stock.

Sivert's investigation identified Russell ("Red") Davis as the dealer who sold the drugs that killed Castro-White. The government indicted Davis on two drug counts. 21 U.S.C. § 841(a)(1). The first charged Davis with distributing a substance containing fentanyl, and the second charged him with possessing with intent to distribute a mixture containing cocaine. The

indictment alleged that Davis should receive an increased sentence on the first count because a death had "result[ed] from" the fentanyl that he distributed. *Id.* § 841(b)(1)(C). Davis pleaded guilty to the cocaine charge but stood trial on the fentanyl charge (with its increased punishment).

At trial, the parties did not dispute that Davis was a drug dealer. His counsel conceded that the evidence was "overwhelming" that Davis sold heroin to Stock and Karaplis. Both men testified that they often bought heroin from Davis before Castro-White's death. The parties instead disputed whether Davis sold the *specific* drugs that killed Castro-White on March 7. The government argued that Davis sold these drugs to Karaplis just after midnight. Davis argued that the drugs came from someone else, such as Stock's friend Erika Matus.

The government offered a simple theme: "Follow the phones." It relied on data from the cellphones of Castro-White, Karaplis, Stock, and Davis. The police recovered text messages sent to and from Castro-White's phone from March 5 to 7 through a subpoena to Verizon. They also seized Davis's phone during a search of his home and were able to retrieve his call logs and text messages. Subpoenas to Karaplis's and Stock's wireless carriers turned up their phones' toll records and cell-site data. Toll records memorialized "the calls and text messages placed to and from" the phones without disclosing the actual content of any calls or texts. Cell-site data identified the phones' general locations at given points in time.

The government's evidence showed that Castro-White started the evening of March 6 watching a movie with his girlfriend. A little before 10:00 p.m., he visited a friend's home and smoked marijuana. He also began texting Stock about a heroin buy, asking him if he was "grabbing at all." Stock replied that he had already done so. After some back-and-forth, Stock told Castro-White: "I can ask Erika if they have some extra to sell but you probably won't feel it at all, I did a two point shot over there house yesterday didn't feel a th[ing]." Castro-White declined: "Yeah I'll just wait for next time with red" (Davis's nickname). Stock then said, "I'll let you know if I go again tonight or if someone else calls me." At 10:46 p.m., Castro-White responded: "Ok thank you." That was the last Stock heard from him.

Castro-White and Karaplis began texting less than an hour later about purchasing heroin from Davis. Castro-White asked Karaplis if he was planning to buy heroin, and the two spoke on the phone. After they hung up, Karaplis texted Davis: "Hey man can I get for me dude." Davis did not respond, so Karaplis called him several times. Davis finally returned his call at 12:06 a.m. Karaplis said they discussed a heroin buy. At 12:15, he texted Castro-White that Davis had been "asleep" and that Castro-White should pick Karaplis up quickly because Davis "might fall back asleep." Castro-White responded: "On way." At 12:18, he texted Karaplis: "Outside." Davis had asked for cigarettes, so they stopped at a gas station on the way. Karaplis called Davis at 12:34 and said he was outside. Cell-site data confirmed that Karaplis's and Castro-White's phones moved from a location near Karaplis's home to one near Davis's. Karaplis walked from Castro-White's car to Davis's house, gave Davis $50 and a pack of Newports, and took what he thought was heroin.

Karaplis and Castro-White drove to Castro-White's house to split the drugs. Castro-White took a "shot" from his portion, with some left over. They then left for Karaplis's home. On arriving, Karaplis also took a shot in his usual amount. He "almost fell out of [his] chair," and Castro-White asked if he was okay. The next thing Karaplis remembered, he "woke up on the ground soaking wet and [Castro-White] was gone." Karaplis frantically called and texted Castro-White beginning at 2:51 a.m. He called Castro-White 11 times between 2:51 and 3:04 and texted him to "please call me asap." There was no answer. Karaplis began calling again at 6:41 a.m., trying Castro-White over 20 times between 8 and 9 a.m. Karaplis was worried about Castro-White because his shot had been "the strongest thing [he had] ever taken."

In the weeks after Castro-White's death, Stock told Davis that the drugs he had sold Karaplis had killed one of their friends. According to Stock, Davis responded: "Okay, I'm not too worried about that because I never sold anything to that person. I do not know him. I just sold to you and Harry."

While Castro-White and Karaplis had thought they bought heroin, the government's evidence showed that Castro-White died of an overdose from fentanyl (a much stronger drug). A toxicologist called the "high" amount of fentanyl in Castro-White's blood "within that area of

concentrations that have been detected in deaths due to fentanyl." And the Lorain County Coroner opined that Castro-White died of a fentanyl overdose between 1:00 and 2:00 a.m.

In his defense, Davis offered evidence to suggest that someone else (possibly Matus) sold the fatal drugs. He pointed to a text message on March 7 at 11:21 a.m. in which he told Karaplis "Was sleep." Because this text came after Karaplis's text from the night before ("Hey man can I get for me dude"), Davis argued that it showed that the two had not connected and that he was explaining why he did not respond. (For her part, Matus denied ever selling drugs to Castro-White or Karaplis and testified that she did not know them well.)

The jury returned a guilty verdict on the fentanyl count and the death-results enhancement. Because Davis had a prior conviction for a felony drug offense, the district court imposed a mandatory life sentence to run concurrent to a 360-month sentence on the other cocaine count.

II

Davis raises six challenges on appeal. He argues at the outset that the government wrongly imposed the death-results enhancement for three reasons. He next raises an evidentiary claim against the coroner's expert opinion and an instructional claim against the district court's response to a jury question. He lastly asserts Fourth Amendment claims against the search of his home.

A. Death-Results Enhancement

Davis's first three arguments challenge his life sentence. Federal law (in particular, 21 U.S.C. § 841(a)) prohibits the knowing distribution of a controlled substance. Section 841(b) then lists different sentences for those "who violate[] subsection (a)" depending on the drug type and quantity. *Id.* § 841(b). Section 841(b)(1)(C) lists the sentences for fentanyl, a controlled substance in Schedule II. *See United States v. Jeffries*, 958 F.3d 517, 519 (6th Cir. 2020). This subparagraph imposes a mandatory life sentence if a defendant with a prior felony drug conviction distributes an illegal substance and death results from its use:

If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and *if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment*, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $2,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both.

21 U.S.C. § 841(b)(1)(C) (emphasis added).

Davis asserts (1) that the district court improperly instructed the jury about this enhancement, (2) that the evidence was insufficient to convict him of it, and (3) that the evidence amounted to a "constructive amendment" of his indictment. These three arguments all share the same legal premise about the proper interpretation of this enhancement. We thus begin with Davis's general legal interpretation and then turn to his specific arguments.

1

In Davis's view, a defendant cannot receive the death-results enhancement unless the defendant directly delivered the drug to the person who died or provided the drug to that victim through a coconspirator. Because Davis did not sell drugs directly to Castro-White or conspire with Karaplis, his argument goes, his conduct should not have triggered the enhancement. Davis misreads § 841(b)(1)(C). The statute requires the government to prove only that the specific drug underlying a defendant's violation of § 841(a) is the same drug that was the but-for cause of the victim's death. This reading follows from both text and precedent.

We begin with the text's ordinary meaning. *Burrage v. United States*, 571 U.S. 204, 210–11 (2014). By its terms, the enhancement applies if there is a "death or serious bodily injury" and this death or serious bodily injury "results from" the "use of such substance" (the drug that the defendant distributed in violation of § 841(a)). 21 U.S.C. § 841(b)(1)(C). Notably absent: any requirement that the defendant directly sell the fatal drugs to the victim who died or conspire with the person who did. The text requires only that the defendant have a connection to the death-causing drugs, not to the deceased person. That is, the drugs supporting a defendant's § 841(a) conviction must be the same drugs that caused death. If so, the enhancement applies whether or not the defendant has a connection to (or even knowledge of) the person who died.

Consider a defendant who runs a cartel that manufactures large amounts of fentanyl. The defendant's "manufacture" of that fentanyl would violate § 841(a)(1). But the defendant might sell this fentanyl to wholesalers, not end users. And the wholesalers might resell it through a diverse chain ending with small dealers. If the government proves that the fentanyl the defendant manufactured is the same fentanyl that caused a user's death, § 841(b)(1)(C)'s text triggers this enhancement even if the defendant did not know the dealer or the decedent. Any other reading would require us to add words to the statute that are not there.

Precedent confirms this view. In *Burrage*, the Supreme Court held that the phrase "results from" requires a but-for causal connection between the victim's *use* of the drug and the victim's death. 571 U.S. at 211–14. The Court nowhere suggested that the government must show, in addition, a close connection between the *distribution* of the drug and that death. To the contrary, *Burrage* emphasized the need "to apply the statute as it is written[.]" *Id.* at 218. We expanded on this point in *Jeffries*. That case rejected the argument that the enhancement includes a proximate-causation element requiring proof that the victim's death was the foreseeable result of the defendant's conduct. 958 F.3d at 520–21. As we observed, § 841(b)(1)(C) "does not speak to the defendant's conduct or the general causal connection between § 841(a)(1) and the death." *Id.* at 521. Rather, the text asks only whether the victim's use of the drug caused the death. *Id.*

Davis's response does not change things. He offers no reading of § 841(b)(1)(C)'s text that supports his view that a defendant must deliver the drug directly to the victim or be linked to the victim through coconspirators. Instead, he bases this view on two decisions—*United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000), and *United States v. Hamm*, 952 F.3d 728 (6th Cir. 2020). *Swiney* explained how the enhancement applies to defendants in a drug conspiracy under 21 U.S.C. § 846. 203 F.3d at 401–06. It relied on a Sentencing Guideline to hold that a coconspirator must be "part of the distribution chain that [led] to [the victim's] death." *Id.* at 406. *Hamm* held that this rule extends to coconspirators convicted of a substantive offense under § 841(a) (not a conspiracy offense under § 846) if the theory of the coconspirators' substantive liability is that they conspired with the person who committed the offense. 952 F.3d at 744–47.

Neither decision applies here.  Davis was not charged with a conspiracy under § 846.  *See Swiney*, 203 F.3d at 400.  Nor was he held liable for his § 841(a) offense on a conspiracy theory. *See Hamm*, 952 F.3d at 744.  And nothing in *Swiney* or *Hamm* suggests that those decisions apply to a case involving a substantive charge under § 841(a) not predicated on a conspiracy. The decisions are thus "irrelevant here because [Davis] is not being held responsible for someone else's actions based on his status as a co-conspirator, but is being punished for his own actions." *United States v. Atkins*, 289 F. App'x 872, 877 (6th Cir. 2008); *see also United States v. Carbajal*, 290 F.3d 277, 284–85 (5th Cir. 2002); *United States v. Soler*, 275 F.3d 146, 152 (1st Cir. 2002).

2

Under this reading of the death-results enhancement, Davis's jury-instruction, sufficiency-of-the-evidence, and constructive-amendment claims all fail.

a. *Jury Instructions*.  Davis argues that the district court erred by failing to instruct the jury that he could be liable only if he distributed the fatal drugs directly to the decedent or conspired with the person who did.  As explained, this view misstates the law.

b. *Sufficiency of the Evidence*.  Davis also claims that the evidence could not support this enhancement on the same ground—because he did not sell the drugs directly to Castro-White or conspire with Karaplis.  Yet, under a proper view of the law, sufficient evidence existed.  For a sufficiency challenge, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hamm*, 952 F.3d at 736 (citation omitted).

Here, a rational jury could have found that the drugs Castro-White used on March 7 were the drugs that Davis distributed to Karaplis, in violation of § 841(a).  Karaplis testified that he got the drugs from Davis and split them with Castro-White.  And text messages, call records, and cell-site data corroborated this testimony.  A rational jury next could have found that Castro-White's death "result[ed] from [his] use of" Davis's drugs.  21 U.S.C. § 841(b)(1)(C).  Based on the fentanyl in Castro-White's blood, the coroner opined that "the use of fentanyl was the but for cause of his death." *Cf. Hamm*, 952 F.3d at 737–38.  The enhancement requires nothing more.

In response, Davis cites *United States v. Ewing*, 749 F. App'x 317 (6th Cir. 2018), which found insufficient evidence for this enhancement. *Id.* at 328–29. The defendant had sold the victim heroin laced with fentanyl, but only fentanyl (not heroin) was in the victim's blood. *Id.* So the defendant's drugs did not cause the victim's death. *Id.* Davis argues that his case is like *Ewing* because Karaplis testified that Davis sold him heroin, but Castro-White died from fentanyl. Yet a rational jury could find that Karaplis thought he was getting heroin but unknowingly received the much stronger fentanyl. Karaplis and Stock suspected Davis might be selling fentanyl because of the potency of his drugs. A scientist who sees "thousands of cases a year" also testified that she cannot visually distinguish the two drugs. Lastly, ample evidence suggests that Castro-White used Davis's opiates (and not others) just before his death.

c. *Constructive Amendment*. Davis lastly argues that the evidence and jury instructions differed from the indictment's allegations to such an extent that his trial resulted in a "constructive amendment" of his indictment. Davis did not raise this objection in the district court, so we review it for plain error. *United States v. Budd*, 496 F.3d 517, 528 (6th Cir. 2007).

Under the Fifth Amendment, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]" U.S. Const. amend. V. In *Stirone v. United States*, 361 U.S. 212 (1960), the Court held that this provision bars the government from charging the defendant of one crime in an indictment and convicting the defendant of another crime at trial. *Id.* at 217–19. The *Stirone* indictment had charged a Hobbs Act violation for interfering with the interstate commerce in one commodity: sand. *Id.* at 213. Yet the jury instructions allowed the jury to convict the defendant for interfering with the interstate commerce in another commodity: steel. *Id.* at 214. The Court held that interference with commerce is an "essential element[]" of the crime and that the indictment alleged only one type of interference, so the "conviction must rest upon that charge and not another[.]" *Id.* at 218.

Courts have long called *Stirone* a case about a "constructive amendment" of an indictment (it did not use the phrase) and have distinguished such an amendment from a mere "variance" between the trial and indictment. *See United States v. Beeler*, 587 F.2d 340, 342 (6th Cir. 1978) (adopting *Gaither v. United States*, 413 F.2d 1061 (D.C. Cir. 1969)); *United States v.*

*Withers*, 960 F.3d 922, 935 (7th Cir. 2020) (Easterbrook, J., concurring) (retracing history). A "constructive amendment" occurs if the instructions and evidence "so modify essential elements of the offense charged that there is a substantial likelihood the defendant [was] convicted of an offense other than that charged in the indictment." *United States v. Warshak*, 631 F.3d 266, 313 (6th Cir. 2010) (citation omitted). A mere variance occurs if the evidence "proves facts materially different from those alleged in the indictment." *Budd*, 496 F.3d at 521 (citation omitted).

These definitions draw a "blurry," "sketchy," or "shadowy" line between an amendment and a variance. *See United States v. Beasley*, 583 F.3d 384, 389 (6th Cir. 2009); *United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002); *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986) (citation omitted). Yet the category of an alleged divergence between the indictment and trial matters greatly. A constructive amendment is "per se prejudicial," so we must reverse without a showing that the difference between the indictment and trial prejudiced the defendant. *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006) (citation omitted). A variance, on the other hand, must "affect[] a substantial right," so we may reverse only if the defendant proves prejudice. *United States v. Mize*, 814 F.3d 401, 409 (6th Cir. 2016) (citation omitted).

What is Davis's constructive-amendment theory? He again relies on his mistaken view of the law. The indictment stated that Davis "distributed to" Castro-White:

> On or about March 7, 2016, in Lorain, Ohio, IND-1, a person whose identity is known to the Grand Jury, did fatally ingest and overdose on a controlled substance, namely fentanyl, which RUSSELL DAVIS, aka "Red," had *distributed to IND-1*. As a result of RUSSELL DAVIS' distribution of fentanyl alleged in Count 1, death did result from the use of fentanyl, a Schedule II controlled substance.

Indictment, R.1, PageID #1–2 (emphasis added). The jury instructions, however, required the jury to find only that Castro-White "died as a consequence of his use of the drugs" that Davis sold, without requiring a finding that Davis himself distributed the drugs to Castro-White. The evidence likewise showed that Davis distributed the drugs to Karaplis.

This difference did not create a constructive amendment. Davis's theory turns on his view that the enhancement required, as an essential element, that the jury find he sold the drugs directly to Castro-White. *See Stirone*, 361 U.S. at 218. It did not. The enhancement required the jury to find only that fentanyl caused Castro-White's death and that this fentanyl had been distributed by Davis. For those "essential elements," the indictment's facts matched those at trial. *See id.* And even if the indictment's language that Davis "distributed to" Castro-White could be read to mean *directly* to him, the language was "surplusage." *Id.*; *Hathaway*, 798 F.2d at 911. The indictment did not thereby charge a different offense—as it would have if, say, it identified a decedent other than Castro-White. Davis thus has not shown that he received an enhanced sentence for conduct "other than that charged in the indictment." *Warshak*, 631 F.3d at 313 (citation omitted).

Davis does not even assert the fallback position that a variance occurred. That is for good reason. He could not show prejudice from the difference between the indictment and trial. He does not argue that he lacked notice of the government's factual theory. *See Beasley*, 583 F.3d at 392. He also "does not assert that he was unable to adequately prepare his defense" or that any difference could expose him to the risk of "future prosecutions based upon the same conduct." *Id.*

All told, the district court properly imposed the death-results enhancement in this case.

## B.  Coroner Testimony

Davis next argues that the district court wrongly allowed the coroner, Dr. Stephen Evans, to give expert testimony that fentanyl caused Castro-White's death. Davis asserts that Evans's failure to order an autopsy rendered his opinion inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Davis did not object at trial, so we again review his claim for plain error. *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007).

Under *Daubert*, a district court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. Federal Rule of Evidence 702 codifies these standards, imposing four requirements that likewise seek to ensure

that "scientific testimony" is "both 'relevant' and 'reliable.'" *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020) (citation omitted); Fed. R. Evid. 702(a)–(d).

Here, there is no dispute that Dr. Evans's testimony was relevant because the government needed to prove that Davis's drugs caused Castro-White's death. *See Burrage*, 571 U.S. at 218–19. This case instead concerns reliability. We have held that experts who give medical-causation opinions may meet *Daubert*'s reliability rules through a "differential diagnosis" or "differential etiology." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010). That method seeks to "rule in" potential causes of a condition and "rule out" other causes. *Id.* We have viewed a differential diagnosis as sufficiently reliable when a doctor: "(1) objectively ascertains, to the extent possible, the nature of the patient's injury"; "(2) 'rules in' one or more causes of the injury using a valid methodology"; and "(3) engages in 'standard diagnostic techniques by which doctors normally rule out alternative causes' to reach a conclusion as to which cause is most likely." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (citation omitted).

When reviewed for plain error, Dr. Evans's opinion meets this test. Davis does not dispute that Dr. Evans's opinion satisfied our framework's first two elements. Dr. Evans explained that his opinion that fentanyl caused Castro-White's death rested on his review of the scene, the body's condition, the police reports, and the lab reports. His investigation of the scene revealed drug paraphernalia that tested positive for heroin and fentanyl. And Castro-White's mouth had a "foam cone" typical of narcotics overdoses. Dr. Evans also ordered blood and urine screens; the urine screen tested positive for opiates and marijuana, while the blood screen showed a fentanyl level that was "three times the highest therapeutic dose[.]"

Davis instead focuses on the third differential-diagnosis element. He says that Dr. Evans's failure to order an autopsy means that he did not engage in "standard diagnostic techniques" to rule out other causes of death (such as Castro-White's asthma or steroid use). Davis's argument contains both legal and factual problems. Legally, we do not typically find plain error where no "binding case law . . . answers the question presented[.]" *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) (citation omitted). And we have found no case

from our court (or others) holding that an autopsy is always a required "diagnostic technique" before an expert may opine on a cause of death.

Factually, Dr. Evans explained that coroners do not always need autopsies. If he can identify the cause of death using other tools, he does so: "We don't disturb a body if we don't need to disturb a body." As far as we can tell on this record, Evans applied "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Best*, 563 F.3d at 181 (citation omitted).

Evans also explained why "an autopsy was not indicated" in this case, including the clear signs of an overdose, as well as the fact that Castro-White was young and healthy. Although Evans knew that Castro-White used steroids and had asthma, he did not need an autopsy to rule out those factors. A steroid death would be "something completely different than what we saw." Steroids lead to "long-term problems but not usually acute problems like this." Similarly, the scene did not indicate that Castro-White had died of an asthma attack. A person having an asthma attack experiences "air hunger" and will "go crazy trying to get air[.]" The person does not "die[] laying in bed calmly." A "foam cone" also does not usually occur outside narcotics overdoses.

None of Davis's cases suggest the contrary. In *Johnson v. Memphis Light Gas & Water Division*, 695 F. App'x 131 (6th Cir. 2017), for example, we noted that an expert's "autopsy report and testimony . . . demonstrate[d] that he *sufficiently* ruled out alternative causes of death." *Id.* at 141 (emphasis added). *Johnson* says nothing about whether an autopsy is always *necessary*.

Davis thus turns to the facts, attacking Dr. Evans's reasons for dismissing asthma as a cause of death. Evans relied on a statement from Castro-White's mother that he only occasionally used an inhaler, but a friend testified that Castro-White had been using his inhaler more often before his death. Davis also questions the basis for Evans's belief that Castro-White died calmly. Neither argument suggests that Evans's approach was so unsound as to render his opinion inadmissible. Although the lack of an autopsy may have affected the weight the jury

should give Evans's opinion, it did not bar the opinion's "threshold admissibility" on our plain-error review. *Best*, 563 F.3d at 182.

## C. Jury Question

Davis also challenges the district court's response to a jury question about the phrase "on or about." The indictment charged Davis with distributing fentanyl "[o]n or about" March 7, 2016. Yet the parties' evidence and argument showed that the distribution occurred *specifically* on March 7. So Davis asked the district court to omit the pattern jury instruction defining "on or about" to mean a date reasonably close in time to the date in the indictment. Davis did not want the jury to think it could rely on other drug sales, especially because background evidence showed that Davis had sold other drugs to Stock (who shared them with Castro-White) earlier on March 6. The court agreed and omitted this instruction. Yet the parties' proposed instructions still used this undefined "on or about" phrase. They charged that "the Government must prove that [Castro-White] died as a consequence of his use of the drugs[] that [Davis] distributed on or about" March 7.

During deliberations, the jury submitted the following question: "Charge 1 alleges that Red distributed drugs 'on or about March 7th.' What is the time frame of 'on or about?'" Davis asked the court to respond "that the evidence presented was that the transaction involved occurred on March 7 at 12:34 a.m." The court responded differently: "'On or about' must be viewed and framed in light of all the evidence the jury must reasonably consider in reaching a verdict on Count 1 and, if applicable, the death enhancement." Davis moved for a mistrial and a new trial based on this response. The court denied his motions. It believed that the safest course was to "refocus[] the jury on the evidence." And since "[b]oth parties argued that the fatal transaction occurred" on March 7, it was "pure speculation" to conclude that the jury would find that other sales caused Castro-White's death.

On appeal, Davis argues that this supplemental instruction was legally wrong and harmful because it allowed the jury to find that the drugs that Davis had sold earlier on March 6 caused Castro-White's death. We see no prejudicial error.

A district court responding to a question from a deliberating jury faces a difficult task. The court "may and should make clear the law the jury is bound to apply[.]" *United States v. Rowan*, 518 F.2d 685, 693 (6th Cir. 1975). Yet the court "must be careful not to invade the jury's province as fact-finder." *United States v. Nunez*, 889 F.2d 1564, 1569 (6th Cir. 1989). The court also must decide how best to resolve these competing concerns quickly to respect the jury's time. We thus typically leave the proper response to the district court's "sound discretion" and will reverse only if the court abuses that discretion in a way that causes prejudice. *Id.* at 1568 (citation omitted); *see United States v. Castle*, 625 F. App'x 279, 283 (6th Cir. 2015).

When discussing the proper response to jury questions, our cases have drawn a distinction between questions of law and questions of fact. If the jury asks a question about the law, we have noted that the district court generally "should clear away its difficulties 'with concrete accuracy.'" *Nunez*, 889 F.2d at 1568 (citation omitted); *United States v. Fisher*, 648 F.3d 442, 448 (6th Cir. 2011). If the jury asks a question about the facts, we have noted that the court may generally instruct the jury "to rely on its own recollection" of the evidence so as not to bias its decisionmaking. *United States v. McClendon*, 362 F. App'x 475, 483 (6th Cir. 2010).

Under this framework, the district court did not abuse its discretion. To begin with, Davis put the court in a dilemma by advocating for the court to omit the definition of "on or about" but ignoring that the parties' proposed instructions used that phrase. The jury asked a legal question about the meaning of the phrase "on or about." To answer that question "with concrete accuracy," the court would have needed to give the very model instruction about "on or about" that Davis opposed. *Nunez*, 889 F.2d at 1568 (citation omitted). Davis, by contrast, asked the court to give a *factual* response to this *legal* question: "that the evidence presented was that the transaction involved occurred on March 7 at 12:34 a.m." This response would have "invade[d] the jury's province as fact-finder" by telling it what facts to find. *Id.* at 1569. Given the circumstances, the district court did not abuse its discretion with what was essentially a compromise ruling directing the jury to the evidence.

Regardless, its response could not have caused "prejudice." *Id.* at 1568 (citation omitted); *United States v. Washington*, 702 F.3d 886, 895 (6th Cir. 2012). We see no risk that the jury based its verdict on the earlier March 6 sale because both parties presented a case that

Castro-White obtained the lethal drugs after midnight on March 7. So, when arguing for a mistrial, Davis's counsel agreed that "there's literally zero evidence in the record that anything that Castro-White obtained at 1:10 p.m. on March 6 was ingested by him which resulted in his death." And Davis asked to omit the "on or about" instruction precisely because the parties offered no such theory. *See United States v. Combs*, 33 F.3d 667, 670 (6th Cir. 1994).

## D. Search Warrant

Davis lastly challenges the district court's denial of his motion to suppress evidence seized from Davis's home on the ground that the search violated his Fourth Amendment rights.

### 1

About a month after Castro-White's death, Detective Sivert sought the warrant to search Davis's home. At trial, Sivert detailed his investigation during that month. Castro-White's iPhone was locked, but Sivert could see the missed calls from "Harry." He immediately interviewed Karaplis. Karaplis lied to him by saying that he refused to help Castro-White buy drugs. Karaplis also mentioned a person nicknamed "Red" as the possible drug source.

Two days later, Sivert received Castro-White's phone records from Verizon. On viewing Castro-White's texts with Karaplis and Stock, Sivert concluded that Karaplis had not been "completely forthcoming." In another interview, Karaplis told Sivert that Red was "some guy from Lorain," but denied having his phone number. He also told Sivert that the "Corey" in the texts was Stock. When Sivert confronted Karaplis with the texts, Karaplis asked for a lawyer. Sivert then talked to Stock. Stock said he bought drugs from Red at a Garden Avenue home.

On April 1, Sivert interviewed Karaplis with a lawyer. Karaplis admitted his role. He described Red and Red's car and provided his phone number. Karaplis also pinpointed on Google Maps the precise Garden Avenue home where he bought drugs from Red on March 7. Sivert drove there. He spotted the car fitting the description that Karaplis had provided and ran the license plate. The car belonged to "Russell Davis." Additional research showed that Davis went by the name "Big Red." Sivert also created a "photo array" of individuals with characteristics like Davis's, and Karaplis identified Davis with "100 percent" confidence.

On April 11, Karaplis contacted Sivert about a text he received from Davis. At Sivert's request, Karaplis made a "controlled call" to Davis. When Karaplis referenced Castro-White's death, Davis asked: "How'd that turn out, did they sweat you a lot?" Sivert took Davis to be asking whether the police had interrogated Karaplis about the fatal overdose.

After this call, Sivert sought the warrant to search Davis's home for his cellphone. His affidavit to a magistrate at the Lorain County Municipal Court stated:

1. In the early morning hours of . . . March 7, 2016, Jacob Castro-White was in contact with Zaharias Karaplis, another heroin user, for the purpose of obtaining heroin.

2. Zaharias Karaplis and Jacob Castro-White made contact with a male known as "Red" and later identified as Russell Davis, on his cellular phone (216) 526-8810 for the purpose of purchasing heroin, both through text and voice communication.

3. Zaharias Karaplis and Jacob Castro-White met with Russell "Red" Davis on March 7, 2016 for the purpose of buying heroin from him.

4. Jacob Castro-White ingested the purported heroin from Russell "Red" Davis and it caused him to overdose. The time between the purchase of the heroin from Russell "Red" Davis and the estimated time of death, by the Lorain County Coroner Steven Evans is approximately one (1) hour.

5. Toxicology tests conducted by the Lorain County Coroner's Office revealed that Jacob Castro-White had a lethal dose of Fentynal in his sytem [sic].

6. On April 12, 2016 at 0945 hours Zaharias Karaplis received a text message from Russell "Red" Davis via his cellular telephone with the number (216) 526-8810.

The affidavit concluded that Sivert had "determined that Russell 'Red' Davis is trafficking in heroin from the residence at 1832 Garden Avenue and is using his cellular telephone (216) 526-8810 as an instrument of his trafficking business."

On April 12, the magistrate issued a warrant that authorized the police to search this Garden Avenue address for a phone with the identified number, records "showing ownership" of that phone, and records "that would identify those using/occupying" the residence. Police seized Davis's phone, paperwork, marijuana and cocaine, and drug-related accessories.

Davis moved to suppress this evidence.  He argued that the affidavit failed to show probable cause that he lived at 1832 Garden Avenue and requested a hearing to decide whether Sivert deliberately omitted Karaplis's initial lies.  *See Franks v. Delaware*, 438 U.S. 154 (1978). The government's response identified the steps Sivert took to connect Davis to this home. Although the affidavit omitted this information, the government believed that the magistrate would "testify that when appropriate he takes additional information from each affiant before issuing a warrant, which he then considers in unison with the affidavit[.]"  And it expected to show that Sivert and the magistrate discussed the case before the magistrate issued the warrant.

The district court scheduled a hearing, but later denied the motion without one.  It held that the affidavit established a nexus between "the alleged criminal activity and [Davis's] residence."  Relying on the government's brief (not evidence), the court noted that Karaplis identified Davis's home as the place of the drug buy and concluded that this identification established probable cause that Davis's phone would be found there.

2

Davis asserts three claims on appeal: that the magistrate lacked the authority to issue the warrant; that the warrant lacked probable cause linking Davis to the place to be searched; and that we should order a "*Franks* hearing" over whether the affidavit omitted material information. We reject Davis's first claim on plain-error review.  And we accept the government's request for a limited remand on his second claim, so we need not consider Davis's request for a hearing.

a. *Magistrate's Authority*.  Davis asserts that the warrant violated the Fourth Amendment because the magistrate lacked the authority to issue it under Ohio law.  Yet Davis never raised this claim in the district court, so we review it only for plain error.  *See United States v. Ramamoorthy*, 949 F.3d 955, 962 (6th Cir. 2020).  Davis's short analysis on this issue may (or may not) have identified an "error," but it is certainly not one that we would call "plain."

The Fourth Amendment says that warrants "shall issue" only in certain circumstances, but does not identify *who* may issue them.  The Supreme Court has set two rules: The issuer "must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search."  *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972).

Beyond this floor, states have "flexibility to determine who has the authority to issue warrants[.]" *United States v. Master*, 614 F.3d 236, 240 (6th Cir. 2010). And if a search otherwise complies with the Fourth Amendment, the Court generally holds that it does not matter that the search violated some state requirement. *Virginia v. Moore*, 553 U.S. 164, 176 (2008). Yet we have carved out an exception to that rule in this context: "State law determines what person is allowed to approve what warrant," so a warrant issued by a person lacking state-law authority violates the Fourth Amendment too. *Master*, 614 F.3d at 239–41; *United States v. Scott*, 260 F.3d 512, 515 (6th Cir. 2010); *cf. United States v. Krueger*, 809 F.3d 1109, 1123–24 (10th Cir. 2015) (Gorsuch, J., concurring).

Here, a "magistrate" of the Lorain County Municipal Court issued the warrant. *See* Ohio Crim. R. 19. Whether this magistrate could validly do so raises a difficult state-law question. The Ohio statutes and rules governing the question are somewhat circular, the Ohio Supreme Court has not resolved the question, and few courts have considered it. On the one hand, state law provides that, after receiving a sufficient affidavit, "the judge or magistrate . . . shall issue the warrant, identifying in it the property and naming or describing the person or place to be searched." Ohio Rev. Code § 2933.23. It thus permits two categories of officials to issue warrants: judges and magistrates. On the other hand, this law defines magistrate to "include[] county court judges, police justices, mayors of municipal corporation, and judges of other courts inferior to the court of common pleas." *Id.* § 2931.01(A). It does not expressly include court-appointed "magistrates" under Ohio Rule of Criminal Procedure 19. And Ohio Rule of Criminal Procedure 2(F) defines "magistrate" for purposes of those rules not to "include an official included within the definition of magistrate contained in" the law. Ohio Crim. R. 2(F). That fact has led some state courts to hold that court-appointed magistrates may not issue warrants. *State v. Kithcart*, 995 N.E.2d 918, 923–24 (Ohio Ct. App. 2013); *State v. Commins*, 2009 WL 4574886, at *4 (Ohio Ct. App. Dec. 7, 2009).

The magistrate in this case thus may well have lacked authority to issue the warrant. But we need not resolve this point because no error was "obvious." *See Ramamoorthy*, 949 F.3d at 960. We "cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). The alleged state-law error here does

not meet this test, at least not when viewed from the perspective of a federal court. To the contrary, the state law on this legal issue is both unclear and "undeveloped." *United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015); *United States v. Bain*, 874 F.3d 1, 30–31 (1st Cir. 2017).

b. *Probable Cause*. Davis also argues that Sivert's affidavit did not establish probable cause to search 1832 Garden Avenue because it included no facts connecting Davis to this home. For an affidavit to establish probable cause, our precedent requires the affidavit to contain a sufficient nexus between the evidence sought and the place to be searched. *United States v. Hang Le-Thy Tran*, 433 F.3d 472, 482 (6th Cir. 2006); *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). The government now concedes that Sivert's affidavit did not contain enough facts tying Davis (and his phone) to this location. It raises two other arguments. The government asserts that if the admission of evidence seized from Davis's home violated the exclusionary rule, the error was harmless in light of the other evidence showing his guilt. Alternatively, it argues that we should issue a limited remand for a hearing because Sivert gave additional oral testimony to the magistrate. We opt for the second course without resolving the first. The hearing could obviate the need to conduct this harmlessness inquiry. And the district court, having overseen the trial, should initially conduct the inquiry if it turns out to be necessary.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation[.]" U.S. Const. amend. IV. This "text does not require oral testimony to be transcribed or otherwise recorded. Nor did the American legal tradition at the time of the Fourth Amendment's adoption." *United States v. Patton*, 962 F.3d 972, 974 (7th Cir. 2020) (citing William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning 602–1791*, at 754–58 (2009)). We thus have long held that an affiant may supplement an inadequate affidavit with factual allegations "presented to the magistrate through sworn oral testimony." *Hang Le-Thy Tran*, 433 F.3d at 482 (citing *United States v. Shields*, 978 F.2d 943, 946 (6th Cir. 1992)).

The government asserts that this process occurred here: The magistrate "recognized that [the warrant] was deficient and took additional oral information" before issuing it. Arg. 23:10–

28. Detective Sivert's trial testimony, moreover, showed that he undertook significant efforts to connect Davis to the residence at 1832 Garden Avenue before seeking the warrant. He had learned that Davis lived at this location through interviews with Karaplis and Stock and had driven to the location and viewed a car registered to Davis parked there. As the district court noted, this evidence *would* establish the required nexus between Davis and the location. *See Hang Le-Thy Tran*, 433 F.3d at 482; *cf. United States v. Feagan*, 472 F. App'x 382, 394 (6th Cir. 2012); *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008). Yet the district court relied on statements in the government's brief for these facts, not statements in evidence. No evidence tells us whether Sivert conveyed these facts under oath to the magistrate before the magistrate issued the warrant, as the government claims. *Cf. Patton*, 962 F.3d at 973–74. The government had planned to introduce evidence detailing this testimony, but the district court opted to resolve the motion without a hearing. So we lack factual findings from the district court on what Sivert told the magistrate.

As we have done in similar circumstances, we will order a remand "for the limited purpose" of conducting an evidentiary hearing on this probable-cause question. *See United States v. Beals*, 698 F.3d 248, 268 (6th Cir. 2012); 28 U.S.C. § 2106. Either party may then appeal, as appropriate, from the district court's resolution. *Beals*, 698 F.3d at 268; 18 U.S.C. § 3731; 28 U.S.C. § 1291.

* * *

We reject most of Davis's claims on the merits. But we issue a limited remand for further proceedings consistent with this opinion on his Fourth Amendment claim.