NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0354n.06

No. 21-1417

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 24, 2022
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) COURT FOR THE WESTERN |
| | ) DISTRICT OF MICHIGAN |
| JAVONTAE QUINTEZ WHITE, | ) |
| Defendant-Appellant. | ) OPINION |
| | ) |

Before: MOORE, GRIFFIN, and THAPAR, Circuit Judges.

GRIFFIN, Circuit Judge.

Elaine Mamagona and her boyfriend, Ryan Hall, used what they thought was heroin. It was actually pure fentanyl, both overdosed, and only Hall survived. A jury concluded that defendant Javontae White distributed the fentanyl that resulted in Mamagona's death, and the district court imposed a mandatory sentence of life imprisonment. On appeal, White challenges the sufficiency of the evidence supporting his conviction and resulting sentence. We affirm.

I.

Mamagona and Hall were dating in the summer of 2018. They also struggled with substance abuse.

On July 7, 2018, Hall purchased a fifth of vodka from a liquor store close to Mamagona's apartment in Grand Rapids, Michigan. They drank it, had lunch together at a local soup kitchen, and then briefly separated so that Hall could cash his paycheck to buy additional alcohol. The

couple consumed more vodka back at the apartment, plus Xanax (secured by Hall that day) and Klonopin (for which Mamagona had a prescription).

They decided to obtain heroin that evening. So, Hall reached out to Mark Blodgett, a middleman (and user himself) from whom Hall had previously purchased the opioid. The two quickly came to an agreement: Hall would give Blodgett one hundred dollars, and Blodgett would obtain heroin, keep some for himself and give the rest—about a half a gram—to Hall.

Blodgett and Hall met at a gas station, and Blodgett contacted his source—defendant Javontae White—to place the order. The two then travelled to an adult theater, where Blodgett split from Hall to make the purchase. Blodgett met with White in the parking lot for less than five minutes, exchanged Hall's money for the drugs, and reconnected with Hall. According to Blodgett, he handed Hall what he received from White: a "paper fold of drugs" containing a "white powdery substance." Hall's testimony was similar, although he "believe[d]" the drugs—the size of a fingernail—were in a white "plastic bag." Hall also testified that Blodgett "told [him] specifically to be careful" because Blodgett "thought it was fentanyl, laced with fentanyl." Indeed, Blodgett told the jury that White's drugs were "unusually strong," and that he had twice overdosed on them, requiring him to be administered the opioid-overdose-countering drug Narcan.

Hall went right back to Mamagona's apartment. They immediately "dumped" the drug "out on the table," and snorted it with a twenty-dollar bill. Hall and Mamagona passed out within minutes.

After using Blodgett's drugs, Hall would usually reach out to Blodgett to "let [him] know what he thought." Blodgett became concerned when he did not hear from Hall that following morning, so he sent Hall a message to make "sure he was all right." He was not. Hall woke up in pain twelve hours later. He was "shaking," "foggy," and feeling like he "had been hit by a car";

blood was pooling in his skin because he was passed out in one position for so long, and his kidneys were not working properly. He consumed more alcohol and used more drugs obtained from Blodgett to dull his pain, and then he discovered Mamagona's dead body. Hall secured police assistance and was transported to a hospital where he received a dose of Narcan to counteract his opioid overdose.

Law enforcement officials quickly worked with Hall to identify the source of the drugs that killed Mamagona. On that very same day, an undercover agent posed as Hall's friend and met Blodgett at the same gas station, who then arranged for another purchase from White. The "deal" was for "[e]xactly the same thing"—one hundred dollars of heroin, some of which would again go to Blodgett. When Blodgett returned from the purchase, he gave the agent "folded pieces of paper that contained some white powder." The substance field tested preliminarily positive for heroin, but a subsequent lab analysis determined it was pure fentanyl. The white substance on Mamagona's table similarly tested positive for fentanyl. With additional help from Blodgett and surveillance, law enforcement officials arrested White that same day. He possessed fentanyl and cocaine at the time of his arrest.

Kent County Medical Examiner Dr. Stephen Cohle performed an autopsy on Mamagona. He concluded that "[h]er cause of death was acute fentanyl, ethanol and methamphetamine toxicity." So, he wrote on her death certificate that she "[o]verdosed on a combination of drugs." Dr. Cohle listed the three substances on his autopsy report "in the order of importance in causing the death." Fentanyl, in his view, "was the most, far and away actually, . . . important cause of her death." Her fentanyl blood level was ten nanograms per milliliter and her eye fluid level was thirteen nanograms per milliliter. These measurements are several times (three and four, respectively) more than what doctors refer to as the drug's "therapeutic" range—i.e., the amount

of drugs in a person's body that provides safe, "optimal results"—and were instead "well within the reported lethal range." Based on the level of fentanyl in her body, Dr. Cohle concluded that the fentanyl alone "would have been enough to kill her even if there had been no other drugs in her body at the time of death." Moreover, Dr. Cohle testified that "but-for the fentanyl, . . . she would not have died." Dr. Cohle opined that she died "probably minutes . . . after taking the fentanyl." He listed ethanol and methamphetamine as contributing factors because her levels were elevated, but not dangerously so like her fentanyl levels.

In addition to Dr. Cohle, two other expert witnesses testified about the role fentanyl played in Mamagona's death. First, the government's independent medical toxicologist, Dr. Bryan Judge presented testimony and conclusions that largely tracked Dr. Cohle's—that she died "specifically [from] her use of fentanyl" and that neither ethanol nor methamphetamine, although present in her system at elevated levels, caused her death.

Dr. Yale Caplan, also a toxicologist, testified on White's behalf. He disagreed with Drs. Cohle and Judge. In his view, Mamagona died of "a mixed toxicology death" and that it was impossible to tell which of the drugs present in her body caused her death. That is, she "could have died given [her ethanol and methamphetamine] levels" without fentanyl. So, he concluded, "her death was the result of the ingestion of multiple drugs in sufficient concentrations." Dr. Caplan also questioned the veracity of the other doctors' reliance on the elevated fentanyl levels, noting that those higher values could have been a reflection of postmortem redistribution.

A grand jury indicted White on three counts: (1) distributing fentanyl resulting in death; (2) distributing fentanyl; and (3) possession with the intent to distribute fentanyl and cocaine, all in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). The indictment's second and third counts stemmed from the controlled buy (count two) and the drugs in White's possession at the time of

his arrest (count three). In September 2020, a jury convicted White on those counts, but could not reach a unanimous verdict on the resulting-in-death count; so, the district court declared a mistrial on count one. White was retried in January 2021 and convicted. Because White had "a prior conviction for a felony drug offense," his death-resulting conviction carried a mandatory term of life imprisonment. § 841(b)(1)(C). The district court imposed such a sentence. White timely appeals, challenging only the sufficiency of the evidence supporting his resulting-in-death conviction and its mandatory life-imprisonment sentence.[1]

II.

A defendant claiming insufficient evidence to support a conviction "faces a high bar" on appeal. *United States v. Persaud*, 866 F.3d 371, 379–80 (6th Cir. 2017). This is because we must uphold a jury's conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We can sustain a conviction based on circumstantial evidence alone, and the evidence need not disprove every hypothesis except that of guilt. *United States v. Lindo*, 18 F.3d 353, 357 (6th Cir. 1994). A sufficiency claim does not allow us to "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (citation omitted). Rather, we "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Id.* (citation omitted).

---

[1]White also suggests that the district court erred when it declined to give a proximate-cause jury instruction. But he forfeited this issue by failing to include it within his statement of issues, *see United States v. Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016), and even if he did not, circuit precedent forecloses his position, *see United States v. Jeffries*, 958 F.3d 517, 520–22 (6th Cir. 2020).

White challenges the sufficiency of the evidence supporting the "death results" enhancement mandated by § 841(b)(1), which "is an element that must be submitted to the jury and found beyond a reasonable doubt." *Burrage v. United States*, 571 U.S. 204, 210 (2014). To impose such an enhancement, a jury must find: (1) knowing or intentional distribution of a controlled substance; and (2) "death caused by . . . the use of that drug." *Id.* Because White admits he knowingly distributed a controlled substance to Blodgett, White's appeal focuses on two aspects of the second element.

A.

For § 841(b)(1)'s death-resulting enhancement to apply, a jury must find that the defendant was "part of the distribution chain" to the overdose victim. *United States v. Hamm*, 952 F.3d 728, 747 (6th Cir. 2020). White asserts there is an evidentiary "gap" between the drugs he sold to Blodgett and those consumed by Mamagona, and therefore no rational jury member could link his drugs to her death. *See United States v. Ewing*, 749 F. App'x 317, 329 (6th Cir. 2018). This argument hinges on his contention that he sold heroin—not fentanyl—to Blodgett. Because there was no evidence demonstrating Mamagona used heroin that day, he contends that his drugs fell outside the distribution chain of the drugs that killed Mamagona. We disagree.

At the outset, it is immaterial that all parties involved discussed the distribution of heroin as the government was not required to establish that White knew he sold fentanyl for the jury to convict him under § 841(a). *United States v. Mahaffey*, 983 F.3d 238, 242–43 (6th Cir. 2020). Regardless, the record evidence makes clear that both Blodgett and Hall had reason to suspect that the substance White delivered contained fentanyl. Blodgett told Hall to "be careful" because he thought "it was fentanyl, laced with fentanyl," and separately stated that White's drugs were "unusually strong," and that he had twice overdosed on them and had to be administered Narcan.

These circumstances strongly support the conclusion that White distributed fentanyl. *See United States v. Davis*, 970 F.3d 650, 658 (6th Cir. 2020) (rejecting a similar *Ewing*-based argument, commenting that "a rational jury could find that [a buyer] thought he was getting heroin but unknowingly received the much stronger fentanyl" in part because witnesses "suspected [the defendant] might be selling fentanyl because of the potency of his drugs").

Consider too the evidence gathered the very next day. No one disputes the substance collected from Mamagona's apartment was pure fentanyl or that Hall had to be administered Narcan to counter the fentanyl's effects. More importantly, White possessed pure fentanyl two-times-over on July 8, 2018. Recall that agents conducted a controlled drug buy that day for the "same" deal and it tested positive for pure fentanyl.[2] The same goes for the drugs White possessed when he was arrested a few hours later.

White resists this strong evidence, intimating that Blodgett's and Hall's differing packaging testimony—a paper fold (Blodgett) versus a plastic bag (Hall)—and Blodgett's prior contacts with other heroin dealers (including on July 7, 2018) demonstrates Blodgett gave Hall drugs different than those obtained from White. This is at best speculation insufficient to pass over a sufficiency challenge's high hurdle. *United States v. Sadler*, 24 F.4th 515, 547–49 (6th Cir. 2022); *see also United States v. Simer*, 835 F. App'x 60, 65–66 (6th Cir. 2020) ("[C]onjecture over

---

[2]White claims it tested positive for heroin; that is true but not the whole picture—it preliminarily tested positive for heroin in the field, but a lab determined it was pure fentanyl. He also suggests the government failed to lay a proper foundation establishing that the drugs the lab tested were the same drugs from the controlled buy. But he did not object to the lab reports' foundation or their admission and does not contend here the district court erred in admitting the evidence or permitting the lab technician to testify about them. To the extent this new evidentiary concern can be interpreted as a sufficiency-of-the-evidence argument, White forfeited it by not developing it in his otherwise specific Rule 29 motion, *Hamm*, 952 F.3d at 739–40, and by raising it for the first time in reply, *United States v. Galaviz*, 645 F.3d 347, 362 (6th Cir. 2011); and regardless, it goes to something not within our purview—the weight of the evidence, *Jackson*, 470 F.3d at 309.

the possibility of unknown intervening sources of drugs is not unfamiliar in this setting. Nor is it typically compelling." (collecting cases)). Faced with evidence establishing White possessed and distributed pure fentanyl the very next day after the transaction in question, any rational jury member could have concluded the testimony was not inconsistent, for Hall was equivocal when describing the packaging ("I believe") and Blodgett confirmed there was "[n]o doubt" that the drugs in question came from defendant. And even if it was inconsistent, it at most raises a credibility issue reserved for the jury (and one we must resolve in favor of the verdict).[3] *Jackson*, 470 F.3d at 309.

For these reasons, any rational juror could conclude the government established White was "part of the distribution chain to the overdose victim." *Hamm*, 952 F.3d at 741.

## B.

That brings us to the causation component of White's appeal. In *Burrage*, the Supreme Court set forth what it means for a death to "result[] from" under § 841(b)(1). 571 U.S. at 210–19. The Supreme Court held that this phrase's "ordinary meaning," is one of "actual causality." *Id.* at 211. Thus, the government is required to prove "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* (internal quotation marks omitted). This "straw that broke the camel's back" approach "represents the minimum requirement for a finding of causation." *Id.* (internal quotation marks and emphasis omitted). So, we have commented, "there are two ways to satisfy the causation requirement of 21 U.S.C. § 841(a)(1) with a 'death results' enhancement under § 841(b)(1)(C): one can provide drugs that are either an

---

[3]White additionally speculates that it could not have been fentanyl he sold to Blodgett because Blodgett did not react like Hall or Mamagona. But this is easily explainable—the jury heard expert testimony about how one who is less experienced with opioid use (like Mamagona) is "much more susceptible to the central nervous system and respiratory depressant effects" than those who are more experienced (like Blodgett).

independent, sufficient cause of the victim's death or a but-for cause." *United States v. Allen*, 716 F. App'x 447, 450 (6th Cir. 2017). White asserts Mamagona died due to a combination of drugs, and therefore the government did not sufficiently establish fentanyl's link to her overdose under either standard. Because any rational juror could conclude the evidence more than established a but-for finding, we are not persuaded.[4]

Where, as here, "use of the controlled substance 'combines with other factors to produce' death," *Burrage*'s but-for causation element is satisfied if the "death would not have occurred 'without the incremental effect' of the controlled substance." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (quoting *Burrage*, 571 U.S. at 211). We have upheld convictions under this standard by relying on testimony from medical experts opining that due to the high dose of a drug in a decedent's blood, he "died because of" the drug, and had it not been used, "he would not have died at that time." *Hamm*, 952 F.3d at 738; *see also Sadler*, 24 F. 4th at 548 (similar); *Davis*, 970 F.3d at 658 (similar); *United States v. Whyte*, 795 F. App'x 353, 364–65 (6th Cir. 2019). (similar).

Comparable evidence was presented to White's jury. It heard how high Mamagona's fentanyl level was—between three and four times the drug's "therapeutic" value, depending upon from where it was measured. The medical examiner told the jury about the importance of that level, and its relative weight compared to the presence of other substances: the amount of fentanyl in her body was "well within the reported lethal range" and that "fentanyl was the most, far and away actually, . . . important cause of her death." That is, "but-for the fentanyl in Ms. Mamagona's body, she would not have died." And the government presented corroborating expert witness

---

[4]We therefore do not address whether the government also established fentanyl was an independent, sufficient cause.

testimony by Dr. Judge, who similarly opined that "she died from drug toxicity, specifically her use of fentanyl."

White says otherwise, claiming there is only one way to look at the medical evidence—that Mamagona died due to a combination of drugs and that it was impossible to isolate fentanyl as causing her death (as his own expert opined). It is true, and undisputed, that she had a variety of substances in her system when she died. And there is no doubt that the medical examiner's report and death certificate list a combination of drugs as contributing to her death. But this argument asks us to go beyond our role as appellate judges—to take a side on the battle of the experts. *See Volkman*, 797 F.3d at 394. And any rational jury member could have credited the testimony of the government's physicians—testimony that is akin to other death-results cases—over White's own expert. *See, e.g.*, *Hamm*, 952 F.3d at 738; *Sadler*, 24 F. 4th at 548; *Davis*, 970 F.3d at 658; *Whyte*, 795 F. App'x at 364–65.

Most problematic for White is *Davis*. There we approved of the very testimony given in this case, holding that "[a] rational jury . . . could have found that [the decedent]'s death 'resulted from his use of' [the defendant]'s drugs. Based on the fentanyl in [the decedent]'s blood, the coroner opined that 'the use of fentanyl was the but for cause of his death.' The enhancement requires nothing more." 970 F.3d at 658 (brackets and citation omitted). True, that sounds like a legal conclusion outside the scope of an expert's testimony, but Dr. Cohle said the same thing without the legalese when he opined that fentanyl was the most important cause of her death and that she would not have died had she not taken fentanyl that night.[5] And yes, one could find it

---

[5]This distinguishes White's main case, *United States v. Ford*, 750 F.3d 952 (8th Cir. 2014), because there, the medical evidence established the "cause of death was the combination of multiple drugs" and that the drug at issue there—morphine—was just a "contributing factor." *Id.* at 955 (emphasis omitted). Indeed, the medical examiner "could not say whether [the decedent] would have died without the morphine in his system." *Id.* (emphasis omitted).

inconsistent to testify as such but then also list the combination of drugs as her cause of death on the autopsy and death certificate. But Dr. Cohle explained his reasoning to the jury, testifying that it was his practice to list elevated substance levels (like ethanol and methamphetamine here) as contributing factors based on Centers for Disease Control protocols; whether he was credible when he did so was for the jury to decide. *Volkman*, 797 F.3d at 394.

A rational juror, therefore, could conclude the government established fentanyl was the but-for cause of Mamagona's death.

III.

For these reasons, we affirm the district court's judgment.